EDWARD T. TABER & another vs. CHINA MUTUAL INSURANCE COMPANY.

SAME vs. COMMERCIAL MARINE INSURANCE COMPANY.

SAME vs. ORIENT INSURANCE COMPANY.

Bristol.    Oct. 24, 1878. — Feb. 23, 1881.   ENDICOTT, LORD & FIELD, JJ., absent.

RICHARD S. HOWLAND vs. INDIA MUTUAL INSURANCE COMPANY.

Oct. 24, 1878; May 5. — June 30, 1881.   COLT, J., absent.

If a ship suffers damage by perils insured against, sufficient to justify an aban-donment, the assured may abandon and recover for a constructive total loss, although the damage is caused by successive perils, and there is no evidence that the damage caused by any one peril is sufficient to justify an abandon-ment.

The constructive total loss of a whaling ship at a port where whaling outfits are bought and sold, and where the outfits are in safety, is not a constructive total loss of the outfits; and evidence of a usage to regard it as such at the port from which the ship sailed is inadmissible.

If the assured in a policy of marine insurance presents to the underwriter a state-ment in proper form of a constructive total loss which the underwriter makes no objection to, and suggests no modification of, the fact that the loss is not also stated therein as a partial loss will not prevent the assured from recov-ering for a constructive total loss, although the policy provides that, " in case of loss, such loss shall be paid in sixty days after proof and adjustment thereof," and that " the assured shall not have the right to abandon the vessel for the amount of damage merely, unless the amount which the insurer would be liable to pay under an adjustment as of a partial loss shall exceed half the amount insured."

When a vessel has been so injured by perils insured against as to become a constructive total loss, yet if she is in a safe port and in no danger of fur-ther injury before communication can be had with the insurer, a sale of the vessel by the master will not dispense with the necessity of an abandon ment.

A delay of two months in making an abandonment, after knowledge of the con-demnation of a vessel by a board of survey, in the absence of evidence that the delay was necessary to enable the assured to ascertain the real extent of the injuries to the vessel, prevents the assured from relying upon the abandonment, although the insurer has not been prejudiced by the delay.

ACTIONS OF CONTRACT on four policies of insurance, the first for $4500, and each of the others for $2250, upon the barque Joseph Maxwell and whaling outfits, on each interest

in proportion as valued, "wherever she may go on a whaling voyage;" three of the policies at and from New Bedford, January 13, 1872, until her return to New Bedford if on or before January 13, 1876, and the policy of the Orient Company at and from San Francisco on December 11, 1872, until her return to New Bedford if on or before January 16, 1876. In the margin of each policy, the vessel was valued at $11,000 and the outfits at $25,000. Each policy contained the usual clause that the insurers should not be liable for any partial loss on goods, or on the vessel or freight, unless it amounted to five per cent.

The policies of the China and India Companies were made at Boston, and were expressed to be "subject to the same risks, conditions, liabilities and restrictions as are taken by the New Bedford insurance companies on whaling risks." The policy of the Orient Company was made at New York, and that of the Commercial Company at New Bedford, and each of these two policies contained the following printed clause : "It is understood and agreed that catchings shipped home during the voyage shall be at the risk of the insured, without diminution of the value of outfits at the time, and that one fourth of all other catchings shall replace the outfits consumed."

In the policy of the Commercial Company it was agreed that, "in case of loss, such loss shall be paid in sixty days after proof and adjustment thereof, the amount of the premium note, if unpaid, and all sums due to the company from the insured when such loss becomes due, being first deducted, and all sums coming due being first paid or secured to the satisfaction of the said president and directors, they discounting interest for anticipating payment." "It is also agreed that the insured shall not have the right to abandon the vessel, for the amount of damage merely, unless the amount which the insurers would be liable to pay under an adjustment, as of a partial loss, shall exceed half the amount insured."

The four cases were together referred to an auditor, who, at the request of all the counsel, made the following report:

"1. The barque Joseph Maxwell sailed in January, 1872, from New Bedford, which was her home port and the intended

terminus of the voyage, and was at Honolulu in April, 1874. On April 25, 1874, she sailed thence for the Arctic whaling season, which lasts from about June to or into October, when the whalers leave the Arctic Ocean and go to Honolulu or San Francisco to recruit. She reached Honolulu on December 1, 1874, damaged by sea peril as follows: Before August 11, the ship had been engaged in whaling among ice, and had lost some of her copper by contact with the ice. On August 11 she went on a shoal, about three miles off Point Barrow in the Arctic Ocean, at 5 P. M. and got off about 2 A. M. following; whether she was injured at this time was in dispute. After this she continued whaling until September 25, during which time she had severe gales, nearly one gale all the time; the wind would lull for a few hours and then come on again; there were head gales during five days and frequent cross seas, and the ship labored heavily. On September 25 a leak of one thousand strokes in twenty-four hours appeared. On September 27 this leak had increased to twelve hundred strokes. In passing Cape Lisburne, on October 14, she had to carry sail in a gale to keep off of a lee shore. During this time the leak increased to four thousand and six thousand strokes; cross seas made the ship labor very heavily here; she was struck aback many times by sudden shifts of wind; ice was forming on her all the time; it was two to three feet thick forward and five or six feet outside. On October 21 she reached Plover Bay, where she anchored in smooth water, and remained nine days, engaged in boiling and stowing down cargo; while at anchor there, she had a heavy gale from the south which lasted in full force two days, during which time injury resulted to the windlass knees, windlass bitts and one hawse-pipe, and the leak was three thousand strokes. On October 30 she left Plover Bay, and when six hours out she encountered another gale and had to carry sail heavy to keep off the land; this gale lasted two days. From the 7th to the 14th of November she was running the Fox Island Passage, in which time there was a cyclone and the leak increased to nine thousand strokes; there were gales, changes of wind and frequent cross seas; the ship was knocked on her beam ends, the leak increased and seas broke over the ship several feet deep; life lines were stretched along the deck. and

men were lashed to the pumps; by these seas two boats were lost, one boat stove, overhead house was crushed, the galley carried away, and some sails and some spars were injured. During the gales in the Arctic Ocean, a working of the beams of the ship appeared, also injury to the rigging, cracks in the foremast and bowsprit, and injuries to other parts. This working and these effects increased in the gales after leaving Plover Bay. The weakening condition of the ship from gale to gale contributed to the injury from subsequent gales. It appeared that, if she had been repaired at Honolulu, the main items of expense would have been re-treenailing, rebolting and putting in additional knees, stripping, calking and coppering. From the beginning of the said peril or perils there was no port of repair short of Honolulu. Plover Bay and all the coasts which she passed were uninhabited, and furnished no opportunity for repair.

" The defendants conceded that losses of the ship had occurred from the foregoing peril or perils insured against, which in the whole, after all due allowances, exceeded fifty per cent of the valuation of the ship. After the plaintiffs had closed their evidence, the defendants admitted that the ship had suffered damage by the perils insured against, sufficient to justify an abandonment of the ship; but contended that said facts proved that this damage had been caused by several sea perils distinct in character, time, place of occurrence and effects, but failed to prove that any one of them had caused damage sufficient to justify an abandonment.

" I reserve this question for the court. If the court should be of opinion that it is necessary for the plaintiffs to prove that damage to that extent had been caused by any one of such perils, the parties agree that the case is to be recommitted to the auditor, with liberty for either party to produce further evidence upon this point; otherwise the parties agree to judgment for the plaintiffs in each case for total loss of ship and outfits, unless a different result shall be required by the decision of the other questions of law herein.

" 2. The plaintiffs contended that a total loss on whaling outfits had occurred because they followed the loss of the ship; and that, if there was a constructive total loss of the ship at or

beyond Honolulu, the outfits also were constructively totally lost if duly abandoned.

" Honolulu is a whaling port of about ten thousand inhabitants, where whaling outfits can be bought and sold.

" The only other evidence on this point, except that relating to the loss of the ship and the breaking up of the voyage, was that of William H. Taylor of New Bedford, who testified, against the defendants' objection, that he had been forty years in the insurance business at New Bedford, and had for many years followed the business of an adjuster of marine insurance losses on whaling risks at New Bedford; and that, when a constructive total loss of a whale-ship occurred abroad in the prosecution of her voyage, the outfits had been deemed to follow the ship and to be constructively totally lost also, and the adventure was broken up, and that losses on outfits had always been so adjusted.

" The defendants contended that proof of damage to the ship sufficient to make a constructive total loss of ship, and proof of abandonment of ship and outfits, did not show a total loss of outfits, either constructive or absolute; and that the contract could not be controlled by the proof of usage contained in the testimony of Taylor, or of usage if proved.

" The auditor finds that Taylor's evidence, if competent, is to be taken to be true in point of fact, and on his evidence that the usage is as stated; and refers the admissibility and effect thereof to the court, and also the question of law as to the loss of outfits.

" 3. The only statement of loss or adjustment presented to the Commercial Insurance Company prior to the suit against it was a statement of total loss of ship and outfits, with proper statement of salvage and the charges, and a statement of the amounts due on each policy and against each office, and was in proper form as a total loss or constructive total loss statement; but it did not purport to be a statement of a partial loss. It was proved that the Commercial Insurance Company never called on the plaintiffs for any further specification, information or detail as to the loss or abandonment, or even prior to the suit intimated to them any alleged deficiency therein, or in any papers or preliminaries, or ever offered to pay anything

whatever on the loss, or had any negotiations with them.  The writ was dated November 19, 1875.  The answer, denying each and every allegation of the declaration, was filed December 29, 1875.  On February 5, 1876, the defendants' attorneys in writing gave ' notice to the plaintiffs that on the trial of this case they shall rely upon the failure of the plaintiffs to produce proper preliminary proofs prior to the commencement of suit, as required by the policy, as well as upon the other defences which are open under the answer already filed.'  The Commercial Insurance Company contended that the suit against it cannot be maintained, for the reason that the preliminary proof was deficient in that it did not contain any adjustment of the loss as a partial loss.  I reserve this question for the court.

" 4.  The first information of the arrival of the ship at Honolulu in an injured condition, and of her condemnation, reached New Bedford, December 21, 1874, by telegram from Richard S. Howland, a plaintiff who lives in San Francisco, and was there in December 1874 and January and February 1875.  This telegram was as follows : ' To Taber, Read & Co.  Barque Joseph Maxwell at Honolulu December 2, thousand and fifty barrels oil, ten thousand five hundred pounds bone.  Ship condemned. Bone arrived by steamer.  Oil awaits my orders, think it had better come here and home by Panama, freight reasonable. Telegraph your opinion.'  Howland's abandonment to the India Mutual Insurance Company was dated February 22, 1875 ; and on February 23 the company wrote a letter to him saying, ' We decline to accept the abandonment, believing that the vessel should not have been condemned and sold.'  On December 31, 1874, abandonments of ship and outfits were made to the China office by three other parties insured on the Joseph Maxwell. About December 31, 1874, the defendants wrote to Brewer & Co. in Honolulu to obtain information concerning the loss on the Joseph Maxwell, and to look out for the interests of the underwriters ; and the reply containing the desired information came on February 9, 1875.  They also wrote to the underwriters' agent at San Francisco for the same purpose, and a letter from him came on January 6, and another letter on February 9, and, on February 8, a letter on the same subject from another party in Honolulu.  The protest, surveys, bills and other papers (a

copy of which was annexed to the auditor's report, and the substance of which is printed in the margin \*) reached New

---

\* The documents presented were fourteen in number, as follows:

1. A letter dated December 4, 1874, from the master of the vessel to the consul of the United States at Honolulu, informing him of the arrival of the vessel at that port, and requesting him to call a survey to ascertain the state and condition of the vessel, and what had best be done for the interest of the parties concerned.

2. A warrant of survey of the same date, under the hand and seal of the consul, addressed to two shipmasters and a master ship-carpenter, directing them to make a survey of the vessel and to report to the consulate.

3. A report of the first survey, dated the same day, stating, "after a careful survey of every visible part of her hull, spars, sails and rigging," that the vessel "has recently sustained severe and extensive damage by stress of weather, and is now leaking about two feet of water every twelve hours. It is impossible, in her present condition, to ascertain the cause or extent of the leak or leaks. We therefore advise that she be discharged forthwith, and hove down for further examination."

4. A letter from the master to the consul, dated December 11, 1874, stating that the cargo had been discharged, and requesting a second survey to be called.

5. A warrant from the consul to the same surveyors, directing them to make a second survey.

6. The report of the second survey, dated December 11, 1874, addressed to the consul, as follows: "At your request we have this day made a further examination and survey of the barque Joseph Maxwell of New Bedford, of the burthen of $262\frac{57}{100}$ tons or thereabouts, and beg to report: That the principal cause of her leaking is that many of the fastenings are loose or broken, especially the bolts and spikes that secure the deck frames, the breast-hooks and the outboard planking. Many of the planks are sprung off in consequence, and the butts have opened out, especially the wood-ends and butts around the bows. The knightheads are started where the head-stays are secured, and the saddle over the bowsprit is broken, leaving the whole bow in a very bad condition at that place. The bulwarks are stove at several places on both sides, and two boats with all their craft have been lost from the davits. To put her in good seaworthy condition, the metal and sheathing will have to be taken off along the side about ten courses down, and off the whole bow to the keel as far aft as after side of the fore rigging. All that surface will have to be refastened and calked, and again sheathed and metalled. The whole top side planksheer and water way seams and quarterdeck will have to be calked. Most of the bulwarks replaced with new. She will also require a new set of knight-heads and a saddle over the bowsprit. Much of the ironwork about the bow will have to be renewed. The whole of the lower rigging and topmast back-stays are unseaworthy and must be replaced with new, and also the fore yard and

Bedford February 3, 1875; but there was no evidence that they or their arrival were known to Howland during that month. There was no evidence that any change in the position or status of the property occurred during January or February, or that the lapse of time in his abandonment made any difference as to the facility of taking the property; and no evidence that he had lain by to take advantage of any change in circumstances except what, if any, is to be inferred from the lapse of time since the vessel had been stripped and sold by the master before the first information arrived; and there was no evidence that she was ever repaired by anybody, but she was broken up.

" The plaintiff Howland contended that upon the pleadings no question as to undue delay in abandoning was open to the defendant. [The declaration alleged and the answer denied that an abandonment was duly made.] The India Mutual Insurance Company contended that the abandonment by Howland was too late; and the auditor reports this question to the

---

foretopgallant yard. The rudder must be unshipped and repaired, and some of the pintles made new. The foremast and bowsprit are both weak and may or may not have to be replaced. We estimate the cost of the above-mentioned repairs at the sum of six thousand dollars. We think it will be for the best interest of all parties concerned that she be sold ' as is.' "

7. An account showing disbursements in Honolulu for the vessel, to the amount of $884.57.

8. An account of the proceeds of sales of the vessel, anchors, sails, &c., amounting to $3702.56.

9. A large printed poster advertising the sale.

10. An affidavit of a merchant of Honolulu as to the sale of the vessel.

11. An affidavit of the auctioneer to the sale.

12. An account showing the disbursements and proceeds of sale.

13. A protest of the master, the first and second officer, and two boat-steerers, made at Honolulu on December 13, 1874, stating the incidents as follows: " These appearers on December 22, 1873, in their capacities aforesaid, sailed in and with the said barque from the port of Honolulu, laden with whaling implements and stores, and bound on a whaling cruise; the said ship was then tight, stanch and strong; had her cargo well and sufficiently stowed and secured; had her hatches well calked and covered; was well and sufficiently manned, victualled and furnished with all things needful and necessary for a vessel in the whaling service, and particularly for the voyage she was about to undertake; after leaving Honolulu on December 22, 1873, they proceeded in search of whales. They cruised westward

court. No question as to any abandonment is raised by any of
the defendants, except the foregoing one as stated."

At the trial, before *Soule*, J., the plaintiffs relied on the audi-
tor's report, the defendants did not contest the facts therein set
forth, and the judge found the facts to be as therein stated,
and, with the assent of the parties, reserved the four questions
of law arising thereon for the consideration of the full court,
upon a report, of which the pleadings were made part, and
which provided that judgment for a total loss of ship and out-
fits should be entered in each case, unless otherwise ordered
by the full court; that any case in which judgment for a total
loss should be entered should be sent to an assessor to report
salvage details and exact amounts, subject to such decisions as
the court might make therein; that if the opinion of the court
should be in favor of the defendants upon either of the first
two questions of law stated in the auditor's report, the cases
that might be affected by further hearing on that subject should
be recommitted to the auditor, with liberty to each party to

---

to Japan, and from Japan to the Arctic Ocean, arriving there about June
11, 1874. Nothing particularly worthy of note occurred thus far, nor until
about September 25, 1874, when heavy gales, strong winds and a heavy sea
commenced, coming from various quarters, and the barque under short sail
labored heavily, when the ship was found to be leaking about one thou-
sand strokes per day. On September 27, 1874, they encountered a heavy
gale from the S. E. and S. S. E. with heavy sea, when it was found that
the ship was leaking at the rate of twelve hundred strokes per day. On
October 7, 1874, the ship was found by the pumps to be leaking four thou-
sand strokes in every twenty-four hours. On October 13, they left the Arctic
Ocean and headed for Plover Bay to try out blubber and avoid heavy seas,
the ship leaking four thousand strokes per day, and had a strong wind
and heavy sea until they arrived off East Cape, on October 18, 1874, ship
leaking six thousand strokes per day, when they anchored in Plover Bay,
the ship leaking at the rate of three thousand strokes per day while in the
bay. They left Plover Bay on October 30 for Honolulu, H. I., where they
arrived on December 2, 1874, encountering heavy gales until they arrived in
the latitude of 40 N., the ship leaking from four to ten thousand strokes per
day. From latitude 40 N. to Honolulu the weather was moderate, but the
leak continued at about ten thousand strokes per day."

14. A letter dated December 14, 1874, from the master of the vessel to
the consul, notifying him that he concurred in the report of the surveyors,
and that he should sell the vessel by public auction for the benefit of whom
it might concern.

produce further evidence on that point, and to report salvage details and exact amounts, subject to such decisions as might be made; and that if the last point stated in the auditor's report was open to the defendant upon the pleadings, the court should pass thereon, or recommit the same for further finding, as the law might require.

*T. M. Stetson & L. LeB. Holmes*, for the plaintiffs.

*J. C. Dodge*, for the China and India Companies.

*G. Marston & C. W. Clifford*, for the other defendants.

GRAY, C. J.    The barque Joseph Maxwell, while on a whaling voyage, by a succession of sea perils, continuing for nearly four months, with no opportunity to repair, first coming in contact with the ice in the Arctic Ocean, then going upon a shoal, and afterwards meeting a succession of heavy gales and cross seas, which made her leak badly, was greatly injured in her hull and rigging, and at last put into Honolulu, and being found upon a survey to have suffered damage by perils insured against to such a degree as, after all due allowances, to exceed half her valuation in the policies, and to justify an abandonment of the ship, was there condemned and sold.

1. In order to constitute a constructive total loss, and consequent right to abandon, on account of damage and expense merely, the ship, according to the English rule, must be in such condition that, if recovered or repaired, she will not be worth the expense necessary to be incurred for the purpose of recovering or repairing her.   According to the American rule, it is enough that, when recovered or repaired, she will not be worth half her value, making all proper allowances.   2 Phil. Ins. §§ 1534–1536.

Under either rule, it is not necessary for the assured to prove that any one peril caused damage sufficient to justify an abandonment.   It is enough that, by the result of perils insured against, the vessel is in such a condition that she is not worth repairing within the rule.   The construction for which the defendants contend would defeat the main purpose of every contract of marine insurance, and, in a large proportion of cases of total loss, would make it impossible to supply the necessary proofs.   As was said by Chief Justice Marshall in speaking of a similar question, " The case has frequently occurred, and a direct

decision might be expected on it, if a construction so foreign from the contract had really been made." *Alexander* v. *Baltimore Ins. Co.* 4 Cranch, 370, 376. And it is inconsistent with what has always been assumed to be the law, although for that reason there is little direct authority upon the point.

In *Wood* v. *Lincoln & Kennebeck Ins. Co.* 6 Mass. 479, Chief Justice Parsons said : " When a ship becomes a wreck, by any of the perils insured against, it is generally a total loss, and the owner may abandon. And a ship becomes a wreck, when, in consequence of the injury she has received, she is rendered absolutely innavigable, or unable to pursue her voyage, without repairs exceeding the half of her value. In this last case, she is not worth repairing, by reason, not of age or natural decay, but by reason of the injury received from some peril. For although the materials, or most of them, may remain, yet such is the disabled state of the ship which they composed, that she can no longer retain her character of a navigable vessel." And he added, by way of illustration, that although, " when a ship is stranded, the assured cannot, for that cause merely, immediately abandon," but may recover for a partial loss, yet, "if she be wrecked by a subsequent storm, while she remains stranded, the owner may abandon."

In *Dickey* v. *New York Ins. Co.* 4 Cowen, 222, and 3 Wend. 658, a ship, by a succession of squalls, gales of wind and heavy cross seas for a fortnight, became so broken and leaky as to be obliged to put into port; and three weeks later, after she had been there surveyed and partly unladen, was driven on shore by a hurricane, and sustained great additional injury. Chief Justice Savage in the Supreme Court of New York, and Chancellor Walworth in the Court of Errors, were clearly of opinion that the assured had the right to abandon for a total loss. 4 Cowen, 247. 3 Wend. 662. And the case was decided in favor of the underwriters upon the sole ground that the assured, by afterwards repairing the ship, had waived that right.

In *Read* v. *Bonham*, 6 J. B. Moore, 397; *S. C.* 3 Brod. & Bing. 147 ; a ship, in coming from Calcutta down the river Hoogly, on July 20, sustained an injury in her rigging by coming in collision with a brig at anchor, but on the same day repaired that injury and proceeded on her voyage ; about the end of the

month, she became leaky; on August 10, she encountered a squall, and bore up for Calcutta, making a foot of water per hour and having to be pumped every hour without intermission, until the 18th, when a storm arose which split her sails; the pump was kept constantly going, and from the continuance of the gale the whole of her rigging became unserviceable; on the 22d, the windlass was carried away, and an anchor and cable lost; and on the 29th, she arrived in a shattered state at Calcutta, and was there afterwards sold by the master, and he testified that he attributed the leaking of the ship in the first instance to her having run foul of the brig in the river. Sir John Copley, Solicitor General, (afterwards Lord Lyndhurst,) and Mr. Serjeant Taddy, for the underwriter, did not even suggest that the fact of the condition of the ship having been caused by successive and distinct perils affected the question whether there had been a constructive total loss; but placed the defence solely upon the points whether there had been such a necessity as to justify the sale, and whether there had been a due abandonment; and the assured had judgment.

If, by the result of perils insured against, the vessel is so injured as not to be worth repairing within the rule, it is settled by decisions of high authority, that even the fact that her unfitness to be repaired is owing in part to her previous defective condition by reason of wear and tear and ordinary causes affords no ground of deduction in computing the degree of the injury, if she was not unseaworthy. *Depeyster* v. *Columbian Ins. Co.* 2 Caines, 85. *Depau* v. *Ocean Ins. Co.* 5 Cowen, 63. *Hyde* v. *Louisiana Ins. Co.* 2 Martin (N. S.) 410. *Peele* v. *Merchants' Ins. Co.* 3 Mason, 27, 77. *Phillips* v. *Nairne*, 4 C. B. 343. *Dudgeon* v. *Pembroke*, L. R. 9 Q. B. 581.

The defendants at the argument relied on that clause of the policy which provides that the insurers shall not be liable for any partial loss on goods, or on the vessel or freight, unless it amounts to five per cent. It may well be doubted whether that clause, the object of which is to prevent dispute and litigation about losses of trifling amount, arising from the perishable nature of goods, or which might reasonably be borne by the assured as coming within the common wear and tear of the ship, has any application to a claim for a constructive total loss.

*Paddock* v. *Commercial Ins. Co.* 104 Mass. 521, 532. *Lincoln* v. *Hope Ins. Co.* 8 Gray, 22, 25. *Kettell* v. *Alliance Ins. Co.* 10 Gray, 144. But no question as to the effect of that clause is presented for our determination. The defendants, at the hearing before the auditor, admitted that the ship had suffered damage, by the perils insured against, sufficient to justify an abandonment of the ship, and contended only that the facts proved that this damage had been caused by several distinct sea perils, and failed to prove that any one of them had caused damage sufficient to justify an abandonment; and the only question, on this part of the case, reserved by the auditor, or by the justice of this court before whom the trial was had, is whether " it is necessary for the plaintiffs to prove that damage to that extent had been caused by any one of such perils."

2. The constructive total loss of the ship was not a constructive total loss of the outfits.

The outfits of a whaling voyage are not covered by a policy of insurance on the ship; and whether they would be covered by an insurance on cargo is doubtful. *Hoskins* v. *Pickersgill,* 3 Doug. 222. *Hill* v. *Patten,* 8 East, 373, 375. *Wolcott* v. *Eagle Ins. Co.* 4 Pick. 429, 433. *Paddock* v. *Franklin Ins. Co.* 11 Pick. 227, 230. *Macy* v. *Whaling Ins. Co.* 9 Met. 354, 366. *Mutual Ins. Co.* v. *Munro,* 7 Gray, 246. 1 Phil. Ins. §§ 463, 496, 497. They differ from cargo in the fact that they are not to be carried to the port of destination, but are intended to be used, and in great part consumed, in the course of the voyage. But, like cargo, they are specific articles, having an existence and a value distinct from the ship, and differ in their nature from freight, which is the earnings of the ship itself. See *Thwing* v. *Washington Ins. Co.* 10 Gray, 443.

An insurance on ship or outfits or cargo, whether for a particular voyage or for a certain time, is not an insurance on the voyage, but only that, during the term of the policy, the ship, outfits or cargo insured shall not be lost or injured by the perils insured against. *Lawton* v. *Sun Ins. Co.* 2 Cush. 500, 518. *Greene* v. *Pacific Ins. Co.* 9 Allen, 217, 224, 225, and authorities cited. 3 Kent Com. 328. A constructive total loss of the ship is not a constructive total loss of the cargo, if the cargo arrives in safety at a port at which it may be sold or transshipped.

*Anderson* v. *Wallis*, 2 M. & S. 240. *Hunt* v. *Royal Exchange Assurance*, 5 M. & S. 47. *Robinson* v. *Commonwealth Ins. Co.* 3 Sumner, 220, 224. *Bryant* v. *Commonwealth Ins. Co.* 6 Pick. 131, and 13 Pick. 543.

In the policies before us, the outfits are valued and insured as a distinct subject from the ship. The plaintiffs, not contending that they can be taken together as one subject of insurance in estimating the amount of damage necessary to make out a constructive total loss, yet insist that by reason of the constructive total loss of the ship there was also a constructive total loss of the outfits. But the outfits, having been separately insured, and having arrived in safety at Honolulu, a large whaling port at which whaling outfits can be bought and sold, cannot, consistently with the well-settled rules of law, be held to have been totally lost by the breaking up of the voyage and the loss of the ship.

The testimony of an adjuster of marine losses in New Bedford that, when a constructive total loss of a whale-ship has occurred abroad in the prosecution of her voyage, the outfits have always been treated as following the ship, and as being constructively totally lost also, was clearly incompetent. Evidence of usage is sometimes admissible to explain the words of the policy describing the subject matter insured. *Macy* v. *Whaling Ins. Co.* 9 Met. 354. *Rogers* v. *Mechanics' Ins. Co.* 1 Story, 603. But it is never admissible to control the rules of law as to the mode in which a loss shall be computed. *Eager* v. *Atlas Ins. Co.* 14 Pick. 141. *Dickinson* v. *Gay*, 7 Allen, 29, 33, 34. *Thwing* v. *Great Western Ins. Co.* 111 Mass. 93, 109. *Matheson* v. *Equitable Ins. Co.* 118 Mass. 209, 214. *Seccomb* v. *Provincial Ins. Co.* 10 Allen, 305.

3. The next question, which affects the Commercial Insurance Company only, is stated on the defendants' brief to be whether the insured is required by the provisions of the policy and the law of insurance to present to the underwriter before action brought, in a case of constructive total loss for amount of damage merely, an adjustment of the loss as of a partial loss.

That being the only question, and it having been distinctly found by the auditor that the statement furnished by the plaintiff to the defendant " was in proper form as a total loss or

constructive total loss statement," the defendants' position cannot be maintained. A statement of the loss as a partial loss would be inconsistent with the plaintiff's claim, and the want of such a statement could not prevent the plaintiff from suing for a constructive total loss. *Fuller* v. *Kennebec Ins. Co.* 31 Maine, 325. An "adjustment," within the meaning of the policy, implies that the loss has been adjusted between the parties, and does not contemplate a statement made by a person employed by the assured alone, although he may be called by himself and by them an adjuster. *Clark* v. *United Ins. Co.* 7 Mass. 365, 368. *M'Lellan* v. *Marine Ins. Co.* 12 Mass. 245, 252. *Barlow* v. *Ocean Ins. Co.* 4 Met. 270, 276, 277. 2 Phil. Ins. *c.* 21. All that the assured can do towards such an adjustment is to present to the underwriters a proper statement, which, if assented to by them, may constitute an adjustment. If they make no objection to the form of his statement, and suggest no modification of it, after reasonable opportunity to do so, they cannot afterwards set up any omission or imperfection in it to defeat his right of action on the policy.

The result is, that in each of the actions brought by Taber, Read & Co. they are entitled to recover for a total loss of the ship, and, according to the terms of the report of the justice before whom the trial was had, those cases are to be recommitted to the auditor, to report salvage details and exact amounts, and to ascertain the amount of the partial loss upon the outfits.

4. Upon the further question made in the action brought by Howland, whether the abandonment was too late, and especially whether, under the circumstances, any abandonment was necessary, the court desires a                         *Further argument.*

Upon this question additional briefs were afterwards submitted by the same counsel.

GRAY, C. J. The judgment already given determines all the questions presented in Howland's case, except that of abandonment.

As the declaration alleges, and the answer denies, that an abandonment was duly made, there can be no doubt that this question is open under the pleadings.

The letter of the defendants to the plaintiff, declining to accept the abandonment, distinctly takes the ground that the vessel should not have been condemned and sold; both the declaration of the plaintiff and the report of the auditor assume that an abandonment was necessary; the plaintiff does not appear to have contended before the auditor, or at the trial, either that the sale was made under such circumstances as to excuse him from making an abandonment, or that the defendants had waived the right to object that the abandonment was not seasonably made; and he consented to the reservation for the determination of the court of the single question whether the abandonment was made too late.

But, assuming it to be open to the plaintiff to contend that upon the facts reported by the auditor no abandonment was necessary, the court, upon consideration, is unanimously of opinion that those facts do not support his contention.

Notwithstanding the dicta in *Smith* v. *Manufacturers' Ins. Co.* 7 Met. 448, 451–453, and in *Graves* v. *Washington Ins. Co.* 12 Allen, 391, 395, it appears to be settled by authority, in accordance with the plainest principles of justice, that when a vessel has been so injured by perils insured against as to become a constructive total loss, and has been lawfully sold by the master, so as to leave nothing in the assured to abandon, no abandonment is needful to perfect his right to recover a total loss from the underwriters. *Gordon* v. *Massachusetts Ins. Co.* 2 Pick. 249, 261, 265, 267. Shaw, C. J., in *Peirce* v. *Ocean Ins. Co.* 18 Pick. 83, 88; and in *Lord* v. *Neptune Ins. Co.* 10 Gray, 109, 116, 124. Putnam J., in *Orrok* v. *Commonwealth Ins. Co.* 21 Pick. 456, 464. *Patapsco Ins. Co.* v. *Southgate*, 5 Pet. 604, 623. *Fuller* v. *Kennebec Ins. Co.* 31 Maine, 325. *Potter* v. *Rankin*, L. R. 5 C. P. 341, and L. R. 6 H. L. 83. But the difficulty in this case is that there was no sufficient proof of such necessity as would justify a sale by the master without notice to the underwriters, and that an abandonment was therefore necessary to enable the plaintiff to recover for a constructive total loss.

The rule upon this subject is well settled in this Commonwealth. In *Gordon* v. *Massachusetts Ins. Co.* 2 Pick. 249, a vessel insured in Boston had been sold by auction by the master

in San Domingo, after surveyors, who had examined her, and directed her to be unloaded and hove down, had upon a further examination reported that, from the damage she had sustained by a gale, and by being driven upon the rocks, she could not be repaired at that place, by reason of the want of materials and the extraordinary cost of making repairs there, without incurring an expense that would exceed the value of the vessel, and therefore they condemned her to be publicly sold for the interest of whom it might concern. The judge presiding at the trial instructed the jury that, if the master acted in good faith, and the surveyors conducted themselves honestly in examining the vessel and in reporting their opinion, the sale was justifiable. But the full court held that the certificate of the surveyors, though entitled to weight, was not conclusive, and that the instruction was too favorable to the assured; and Chief Justice Parker, in delivering judgment, said: " It is certain that a master of a vessel, as such, has no authority to sell the vessel or the cargo, unless in a case of extreme necessity." 2 Pick. 262. In *Hall* v. *Franklin Ins. Co.* 9 Pick. 466, the court, speaking by that most learned and accurate commercial lawyer, Mr. Justice Putnam, reaffirmed this rule, and added: " There must be something more than expediency in the case ; the sale should be indispensably requisite. The reasons for it should be cogent. We mean a necessity which leaves no alternative; which prescribes the law for itself, and puts the party in a positive state of compulsion to act. The master acts for the owners or insurers, because they cannot have an opportunity to act for themselves. If the property could be kept safely until they could be consulted, and have an opportunity, in a reasonable time, to exercise their own judgment in regard to the sale, the necessity to act for them would cease." 9 Pick. 478. The rule thus laid down has been uniformly upheld by this court in subsequent cases. *Winn* v. *Columbian Ins. Co.* 12 Pick. 279, 282, 286. *Bryant* v. *Commonwealth Ins. Co.* 13 Pick. 543, 554. *Peirce* v. *Ocean Ins. Co.* and *Orrok* v. *Commonwealth Ins. Co.*, above cited. *Stephenson* v. *Pacific Ins. Co.* 7 Allen, 232, 235. To the same effect are the decisions of the Federal courts in *Patapsco Ins. Co.* v. *Southgate*, 5 Pet. 604, 620, 621 ; in *The Sarah Ann,* 2 Sumner, 206, 215, and 13 Pet. 387, 401, 402 ; and in *The*

*Amelie,* 6 Wall. 18, 27; and of Dr. Lushington in *The Bonita,* Lush. 252, 563.

In the present case the vessel arrived at Honolulu on December 2, 1874. A survey was immediately called, and the surveyors, after an examination, reported that she had sustained severe and extensive damage, and advised that she be discharged and hove down for further examination, which being done, and a further examination had, they on December 11 made a report, particularly stating her condition, and the nature and extent of the repairs which she needed, and expressing their opinion that it would be for the best interest of all parties concerned that she should be sold as she was. Knowledge that the vessel had arrived at Honolulu, and had been condemned, reached the plaintiff at his residence in San Francisco within such time that a telegram from him stating those facts was received by Taber, Read & Co. (the assured in the other cases argued with this) at New Bedford on December 21, ten days after the final report of the surveyors; and on December 31 Taber, Read & Co. and other parties insured on the vessel and outfits made abandonments of their interests to the underwriters. Honolulu was a safe harbor, and there is no evidence whatever of any danger of further injury to the vessel by postponing the sale until the underwriters could be informed of the facts and have opportunity to instruct some one in Honolulu to protect their interests.

The plaintiff therefore wholly fails to prove that the sale made by the master on December 22 had any validity or effect as against the defendants; and he was under the same obligation to make an abandonment as if the vessel had not been sold.

As soon as the assured has, or using due diligence can obtain, knowledge of the facts constituting a constructive total loss, he is bound promptly to elect whether to treat the loss as partial or as total; and, in the latter alternative, to abandon within a reasonable time, in order that the underwriters may take immediate steps to protect the interest in the property which vests in them by virtue of the abandonment. As was said by Lord Kenyon in an early and leading case, "The assured must make his election speedily, whether he will abandon or not, and put

the underwriter into a situation to do all that is necessary for the preservation of property, whether sold or unsold." *Allwood* v. *Henckell*, Park Ins. (8th ed.) 399, 400.

As we have already seen, the plaintiff had knowledge of the condemnation of the vessel within ten days after it took place; and other parties interested in the subject insured made abandonments only ten days later. The protest, survey, bills and other papers relating to the condemnation and sale reached New Bedford on February 3, (although it does not appear that this was known to the plaintiff during that month,) and the underwriters themselves obtained from Honolulu by February 9 all the information that they required. The plaintiff made no abandonment until February 22, two months after he knew of the condemnation; and he has produced no evidence having any tendency to show that the delay was necessary to enable him to ascertain the real extent of the injuries to the vessel, or that he was in fact prosecuting any inquiries upon that subject. The defendants have in no wise waived the necessity of an abandonment, but on the contrary promptly refused to accept it. That they were not prejudiced by the plaintiff's delay does not excuse him from the duty of making an abandonment seasonably. *Mellen* v. *Louisiana Ins. Co.* 5 Martin (N. S.) 563. Upon the undisputed facts of the case a jury would not be warranted in finding that the abandonment was made within a reasonable time. *Livermore* v. *Newburyport Ins. Co.* 1 Mass. 264. *Smith* v. *Newburyport Ins. Co.* 4 Mass. 668. *Orrok* v. *Commonwealth Ins. Co.* 21 Pick. 456. *Reynolds* v. *Ocean Ins. Co.* 22 Pick. 191. *Gernon* v. *Royal Exchange Assurance*, 2 Marsh. 88, 91; *S. C.* 6 Taunt. 383, 387. *Hunt* v. *Royal Exchange Assurance*, 5 M. & S. 47. *Aldridge* v. *Bell*, 1 Stark. 498. *Kaltenbach* v. *Mackenzie*, 3 C. P. D. 467.

The result is, that the plaintiff Howland is not entitled to recover for a total loss, and, according to the agreement of the parties and the terms of the report, his case must be recommitted to the auditor to ascertain the amount of the        *Partial loss.*