## ST. PAUL FIRE & MARINE INS. CO. v. AMERICAN FOOD PRODUCTS CO.

Circuit Court of Appeals, Eighth Circuit.
September 9, 1927.

No. 7634.

1. **Insurance ⊕665(4)—Evidence held to support finding of amount of damage from fire to insured cargo.**

Defendant was one of the insurers of a cargo of frozen beef of agreed value shipped by plaintiff from New York to Gothenburg, Sweden, on a refrigerated ship. Before reaching destination a fire on board damaged a large part of the cargo. Lloyd's agent was made agent of all parties, and under his direction the beef was stored in freezing plants, the part damaged which was usable was reconditioned, and the cargo sold by plaintiff's sales department, which kept account of receipts and expenses. Held, that the evidence of such record, with evidence to show the market price of sound beef in Gothenburg, was sufficient to support a verdict finding the amount of the loss.

2. **Evidence ⊕354(13)—Books of account, entries being made from vouchers kept by direction of mutual agent of the parties, held competent evidence.**

The books of account, showing sales and expenses, entered from vouchers kept by direction of the mutual agent of the parties and properly authenticated, held competent evidence though the salesmen who made the sales and the persons to whom expenses were paid were not produced as witnesses.

3. **Evidence ⊕382—Competency of books of account must be left largely to sound discretion of trial judge.**

Identification of books of account and the foundation for their introduction in evidence is an intensely practical matter, and one that

must generally be left largely to the sound discretion of the trial judge.

**4. Evidence ⬡═376(1)—Modern business conditions require liberal construction of rules governing introduction of books of account.**

The increasing complexity of the conditions under which modern business is carried on has called for a liberal construction of the rules governing the introduction of books of account and entries in the course of business.

**5. Reference ⬡═99(6)—Admission of report of auditor within discretion of court.**

The report of an auditor appointed to take testimony and make findings may be used only if, and so far as, acceptable to the court.

**6. Insurance ⬡═560(1)—Insurer, retaining proofs of loss without giving notice of objections until after suit, could not question their sufficiency.**

Insurer, which received and retained proofs of loss without giving notice of objection until after suit, *held* estopped to question their sufficiency.

In Error to the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Action at law by the American Food Products Company, as substituted plaintiff for Morris & Co., against the St. Paul Fire & Marine Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

D. Roger Englar, of New York City, and Thomas T. Fauntleroy, of St. Louis, Mo. (Bigham, Englar & Jones, of New York City, Abbott, Fauntleroy, Cullen & Edwards, of St. Louis, Mo., and George S. Brengle, of New York City, on the brief), for plaintiff in error.

John M. Lee, of Chicago, Ill., and T. H. Caraway, of Jonesboro, Ark. (M. P. Huddleston, of Paragould, Ark., on the brief), for defendant in error.

Before WALTER H. SANBORN and BOOTH, Circuit Judges, and MILLER, District Judge.

BOOTH, Circuit Judge. This is a writ of error to a judgment recovered on two policies and three certificates of marine insurance. The controversy grows out of a claim for damages sustained by Morris & Co. (predecessor in interest of defendant in error) on a shipment of frozen beef from New York to Gothenburg, Sweden, in the summer of 1919. For convenience the parties will be designated as below; plaintiff in error was defendant.

The shipment of beef was covered by a number of insurance policies; a fire occurred on shipboard during the voyage, damaging the beef; and, the parties having failed to adjust the claim, suits followed. Seventeen of such suits were brought in the state circuit court of Greene county of the state of Arkansas in the summer of 1923. Two of them were against plaintiff in error. All of the suits were removed to the United States District Court for the Eastern District of Arkansas. They were there consolidated as suit No. 257, entitled "Morris & Co. v. Globe & Rutgers Fire Insurance Company." An auditor was appointed by the court to hear evidence, make findings, and be prepared to testify. Later, by mutual agreement, the two cases against the present defendant were withdrawn from the consolidated suit, reconsolidated, and tried before the court and a jury.

Plaintiff in its complaint alleged the shipment of the meat, the insurance on the same in the amount of $919,488 (that being the valuation fixed in the policies), of which defendant carried $57,940, the occurrence of fire on board the ship, the resulting damage to the meat, the furnishing of proofs of loss, compliance with all the conditions of the insurance policy, the demand for payment, and the refusal. Defendant in its answer admitted the shipment, the insurance, and the fire on shipboard, and the receipt of certain documents purporting to support plaintiff's claim, but denied the sufficiency of the same, denied damage to the meat by reason of the fire, except to the extent of $28,331, denied the value of the meat was $919,488, and set up that any loss above the amount admitted in the answer was due to causes other than the fire.

On the trial it was admitted that there was no fraudulent over-valuation in the insurance policies. It was mutually agreed by the parties that, if the jury should find for plaintiff, it might find the total damage sustained, and that the court would apportion the damage under the numerous policies. The jury found a total damage of $382,511.-32; whereupon the court entered judgment against defendant for its proportionate share thereof, amounting, with interest, to $30,686.23.

The specifications of error raise the following main questions: (1) Whether the court erred in denying defendant's motions (a) for a directed verdict in favor of defendant; (b) for a directed verdict in favor of plaintiff for the sum of $28,331. (2) Whether the court erred in admitting in evidence (a) the books of account kept by plaintiff, showing the sales of the meat and the expenses incident thereto; (b) the testi-

mony of Brink relative to the books and vouchers showing the sales and expenses. (3) Whether the court erred in excluding the report of the auditor and his testimony relative thereto. (4) Whether the failure by plaintiff to prove that it had furnished proofs of loss to defendant precluded a recovery. (5) Whether the court erred in refusing to give to the jury the charges requested by defendant.

### The Motions for Directed Verdicts.

At the outset it is contended by plaintiff that the motion for directed verdict in favor of defendant was properly denied, because it was a motion made at the close of all the evidence, on the ground that the evidence of *plaintiff* (instead of *all the evidence*) was not sufficient to support a verdict for plaintiff. We pass this contention by with the remark that the error in phraseology was a mere inadvertence, which misled neither the court nor counsel, and should have been disregarded, as it doubtless was. It thus becomes necessary for us to examine the transcript of the record containing the evidence. This transcript, consisting of some 1,800 pages, could by a little care and effort on the part of counsel have been reduced by one-third to one-half. We wish to express a most emphatic disapproval of the practice of dumping into the transcript of record great masses of irrelevant and immaterial matter.

A careful examination of the record has led us to the conclusion that there is substantial evidence tending to establish the following facts, although some of the evidence is in sharp conflict, either of a direct or indirect nature:

June 30, 1919, the steamship Ice King sailed from New York to Rotterdam and Gothenburg, having as part of its cargo 23,521 quartersides of frozen beef, weighing 1,427 tons, belonging to plaintiff and destined for Gothenburg. The Ice King was a refrigerated ship, and all of the meat was stowed in refrigerated compartments. Each compartment was refrigerated by its own independent coils. The meat was stowed in four compartments: No. 2 'tween decks, No. 2 lower hold, No. 4 'tween decks, No. 4 lower hold. The two holds were separated from each other by No. 3 hold, used as a coal bunker, and by the fire and engine room. No. 2 was forward of the coal bunker; No. 4 was aft of the engine room. Between the coal bunker and No. 2 hold was a steel or iron bulkhead. A similar bulkhead separated the engine room from No. 4 hold. These bulkheads were supposedly watertight and airtight.

While the ship was at Rotterdam, or shortly after it had left that port on its way to Gothenburg, via Newcastle, a fire was discovered in the coal bunker next to No. 2 hold. In order to extinguish the fire, the bunker was flooded, and while this was being done it was discovered that water was entering No. 2 hold. After the ship reached Gothenburg, the fire in the bunker again broke out, and the fire department of the city was called to extinguish it. The fire was sufficient to heat the bulkhead between the coal bunker and No. 2 hold red hot, and to char some of the woodwork and some of the meat in No. 2, though there was a considerable thickness of insulating material between the bulkhead and the woodwork. A period of about three weeks elapsed between the first discovery of the fire and the complete extinguishment of the same at Gothenburg.

Mr. Smith, Lloyd's agent at Gothenburg, was called upon to make a survey of the cargo. By agreement he was adopted as the agent of the insurance companies, and it was further agreed that he should handle the damaged cargo. He made three reports, at intervals covering more than a year, touching the condition of the cargo and the disposition of the same. The reports are in evidence. The meat was sold under his supervision through the sales department of Morris & Co., and the accounts were kept by the bookkeeping department of that company. Most of the meat was sold in Sweden. About 180 tons were shipped to Germany and sold there.

When the meat was unloaded from the ship, it was taken in refrigerator cars to four freezing establishments; one at Hallsberg, two at Gothenburg, and one at Kristianstadt. It was inspected at these freezers by official veterinarians. A small portion was found unfit for any use, and destroyed. Another comparatively small portion was sold as offal. The great bulk of it was found fit for human consumption, and was sold as such. It was found necessary, however, to recondition a considerable portion of it by washing, scraping, and trimming.

Papers purporting to be proofs of loss and adjustment of loss were furnished to the insurance companies by plaintiff; but settlement of the loss not having been made, the present suits above mentioned were commenced.

[1] One of the main contentions of defendant is that it was vital to any recovery by plaintiff that there be introduced evidence

(a) of the value of the meat in the absence of the damage insured against; (b) of the value of the meat in its damaged condition. It is further contended that the evidence wholly failed to prove either of these facts.

We cannot assent to the latter contention. It was the claim of plaintiff, and there was evidence tending to support it, that practically the whole of the meat destined for Gothenburg was damaged by the fire, or by the means used to extinguish the same; that the damage resulted from burning, partial thawing, discoloration, dirt, smoke, and coal dust. There was evidence tending to show that this damaged condition of the meat was due to the fire and the means used to extinguish the same. There was evidence tending to show that the meat had come from prime cattle; that it had passed inspection of the Board of Animal Industry of the United States before being shipped; that the agreed value of the meat at the time of shipment was $919,488. There was also evidence tending to show what sound, undamaged meat of the same character was worth in Gothenburg at the time the shipment arrived. There was also evidence tending to show what the meat in its damaged condition was worth and was sold for, and that the sales were made below the market price for sound beef, because of the damaged condition. Among the witnesses who testified relative to the foregoing matters were persons who saw the meat and the condition of the holds before the meat was unloaded; persons who inspected the meat at the several freezers where it was stored; persons who bought considerable quantities of the meat; persons who cooked and ate some of the meat.

There was also evidence tending to show the additional expenses incurred in disposing of the meat by reason of its damaged condition. From this evidence the jury was able to, and did, determine the loss sustained by plaintiff for which defendant was liable. While it must be said that the evidence as to some of the foregoing matters was not strong in character, yet we are not authorized to pass upon the weight of the evidence.

It must be borne in mind that this meat was sold under the supervision of defendant's own agent. Mr. Smith, Lloyd's agent, and Mr. Halline, to whom he gave power of attorney to act in his absence, were agents of all parties in the liquidation, in the sales, and in the payment of expenses incidental to the same, throughout the whole period in which the meat was sold. Mr. Smith authorized the sales department of plaintiff to sell the meat in conjunction with him, and authorized the bookkeeping department of plaintiff to make the collections and keep the accounts of the sales and the expenses. The sales agents and the bookkeepers, therefore, were the agents of defendant, as well as of plaintiff; and defendant is estopped, in the absence of proof of fraud or mistake, to question the bona fides of the sales or the correctness of the accounts.

Our conclusion is that the case was properly submitted to the jury, and that there was substantial evidence to support the verdict.

What we have said relative to the motion to direct a verdict for defendant, renders unnecessary a discussion of the motion by defendant to direct a verdict for plaintiff for a limited amount.

### The Books of Account and the Testimony of Brink.

[2] Certain summaries of the books of plaintiff, showing the sales accounts of the meat and the expenses incurred in connection with the same, were introduced in evidence. It is conceded that the summaries were correct reflections of the books, but it is contended by defendant that the books themselves and the testimony of Brink relative thereto were not competent, and therefore the summaries were not competent.

As already stated, the evidence showed that the sales of the meat were made through the sales department of plaintiff under the supervision of Lloyd's agent, who was adopted by defendant as its agent; that by agreement of said agent the proceeds of the sales were collected by, and the accounts were kept by, the bookkeeping department of plaintiff; that by agreement, also, the expenses incurred were paid by plaintiff, and the accounts thereof kept. All of this was done by authority and under the supervision of said Lloyd's agent. The books were thus kept by persons who were agents both of plaintiff and of defendant.

These books of account were kept by or under the immediate supervision of Mr. Brink, an accountant and an employé of plaintiff, during most of the time when the meat was being sold. For a short part of the period they were kept by or under the supervision of Mr. McLeod, an auditor and employé of plaintiff. Both of these men testified that the books were properly and accurately kept, and in the usual course of business. The data of the sales from which invoices, and afterwards entries on the books, were made, came to the bookkeeping depart-

ment of plaintiff from the sales agents, sometimes by telephone, sometimes by telegram, sometimes by mail. An invoice with draft attached and a delivery order directed to one of the freezing establishments, where the meat was, would then be made out by the bookkeeping department and sent to a bank for collection, and the purchaser was notified. Upon payment of the draft, the invoice and delivery order were given to the purchaser. Upon presentation of the delivery order to the freezing establishment, the purchaser received the meat. Report was made by the freezing establishment to the bookkeeping department of plaintiff, and the transaction was entered upon the books of plaintiff. If the exact number of pounds was not delivered, owing to the fact that the meat was in quarters, adjustment was made, and correction entries followed. Expenses were entered upon the books from vouchers received from the various parties to whom the money was paid. The sales agents who sent in the original orders were not produced as witnesses; nor in many instances were the parties to whom the expenses had been paid. It was mainly because of the absence of these witnesses that objection was made to the introduction in evidence of the books and the vouchers.

[3] The identification of books of account and the foundation which should be laid for their introduction in evidence is an intensely practical matter, and one that must generally be left largely to the sound discretion of the trial judge. The vital questions are: Do the books probably represent truly the facts which they purport to show? Are they the best and most available evidence?

[4] The increasing complexity of the conditions under which modern business is carried on has called for a liberal construction of the rules governing the introduction in evidence of books of account and entries in the course of business. This is clearly recognized by leading authorities. Professor Wigmore in his work on Evidence (section 1530) says:

"Suppose an offer of books representing transactions during several months in a large establishment. In the first place, the employees have in many cases changed and the former ones cannot be found; in the next place, it cannot always be ascertained accurately which employee was concerned in each one of the transactions represented by the hundreds of entries; in the third place, even if they could be ascertained, the production of the scores of employees, to attend court and identify in tedious succession the de-

tailed items of transactions, would interrupt and derange the work of the establishment, and the evidence would be obtained at a cost practically prohibitory; and, finally, the memory of such persons, when summoned, would usually afford little real aid. If unavailability or impossibility is the general principle that controls, is not this a real case of unavailability? Having regard to the facts of mercantile and industrial life, it cannot be doubted that it is. In such a case, it should be sufficient if the books were verified on the stand by a supervising officer, who knew them to be the books of regular entries kept in that establishment, and the production on the stand of a regiment of bookkeepers, salesmen, shipping clerks, teamsters, foremen, or other subordinate employees should be dispensed with. No doubt much should be left to the discretion of the trial court; production may be required for cross-examination, where the nature of the controversy seems to require it. But the important thing is to realize that upon principle there is no objection to regarding this situation as rendering in a given case the production of all the persons practically as impossible as in the case of death.

"The conclusion is, then, that where an entry is made by one person in the regular course of business, recording an oral or written report, made to him by one or more other persons in the regular course of business, of a transaction lying in the personal knowledge of the latter, there is no objection to receiving that entry under the present exception, provided the practical inconvenience of producing on the stand the numerous persons thus concerned would in the particular case outweigh the probable utility of doing so. Why should not this conclusion be accepted by the courts? Such entries are dealt with in that way in the most important undertakings of mercantile and industrial life. They are the ultimate basis of calculation, investment, and general confidence in every business enterprise; nor does the practical impossibility of obtaining constantly and permanently the verification of every employee affect the trust that is given to such books. It would seem that expedients which the entire commercial world recognizes as safe could be sanctioned, and not discredited, by courts of justice. When it is a mere question of whether provisional confidence can be placed in a certain class of statements, there cannot profitably and sensibly be one rule for the business world and another for the courtroom."

Jones in his work on Evidence (volume 3, p. 569) states the rules as follows:

"The former strict idea of what constituted original entries has been modified to fit the necessities of new business conditions. Inasmuch as under the modern methods of extensive business houses the information relative to the transactions constituting the accounts must pass through various hands before being permanently recorded, some system of temporary memoranda preparatory to the permanent records is necessary to insure convenience as well as accuracy. It would be impracticable to preserve for any great length of time the tags, slips, or tokens constituting such original memoranda, and impossible, in view of the changing of employees, to obtain the testimony of the person who made the temporary memoranda or conducted the transaction. Hence, following the rule of necessity, the courts do not regard such temporary memoranda as the originals, but look to the permanent records as such original entries when properly verified by a suppletory oath. In this particular, every case must be made to depend very much upon its own peculiar circumstances, having regard to the situation of the parties, the kind of business, the mode of conducting it, and the time and manner of making entries."[1]

Many of the courts also have evinced the same liberal spirit in respect to the introduction in evidence of books of account and en-

tries in the course of business. Miss. River Logging Co. v. Robson, 69 F. 773, 781 (C. C. A. 8); United States v. Mammoth Oil Co., 14 F.(2d) 705, 732 (C. C. A. 8); Matson Nav. Co. v. United Eng. Works (C. C. A.) 213 F. 293; Rutan v. Johnson & Johnson (C. C. A.) 231 F. 369, 378; E. I. Du Pont de Nemours & Co. v. Tomlinson (C. C. A.) 296 F. 634; Straus v. Victor Talking Mach. Co. (C. C. A.) 297 F. 791; Cub Fork Coal Co. v. Fairmont Co. (C. C. A.) 19 F. (2d) 273. In the Du Pont de Nemours Case the court said (page 640):

"In recent years the conditions, of necessity, justifying the use of a record without the supporting testimony of the entrant have been extended beyond the circumstances of death and absence from the jurisdiction. The courts have recognized other cases of unavailability as sufficient. This is particularly true of records of modern industrial activities, in which the facts are complex and the persons concerned so numerous that no one of them has an accurate recollection of the whole chain of events, or indeed, ever had a complete knowledge of it. The record itself in these cases is in effect the best and only evidence of the transaction. If it is identified, and its correctness and regularity are established, there is no sound reason why it should not be accepted as proof of great value. In the case at bar the regularity is fully approved. The records were made contemporaneously with the facts, by persons employed for the purpose by the railroad company in the regular course of business, as part of a system habitually employed, in order that the railroad might have an accurate account to which reference might thereafter be made in the conduct of its affairs. The identity and correctness of the record is proved by the supervising agent and clerk who was charged with the duty to cause the record to be made, and to preserve it for future reference and use."

In the Straus Case the court said (page 805):

"* * * Courts must keep pace with the problems of administration developed by large business enterprises. We know and appreciate the difficulty of proving the actual mailing of a letter by an office boy, when hundreds of letters daily issue from large business houses. We likewise know and appreciate the impracticability of producing so-called common-law proof of every detail of purchase or sale in a large business like that of plaintiffs. The progress of men and affairs constantly presses on the common law, and makes it yield with traditional elasticity, to the requirements of the times."

[1] A committee of experts to propose specific reforms in the law of evidence, appointed by the Legal Research Committee under the Commonwealth Fund, has recently made a study of the rules of evidence governing the admissibility of books of account and entries in the course of business, and has recommended a uniform statute, providing substantially as follows:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event shall be admissible in evidence in proof of said act, transaction, occurrence or event, if the trial judge shall find that it was made in the regular course of any business, and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term business shall include business, profession, occupation and calling of every kind." Page 63, "The Law of Evidence, Some Proposals for Its Reform," by Edmund M. Morgan, Zechariah Chafee, Jr., Ralph W. Gifford, Edward W. Hinton, Charles M. Hough, William A. Johnston, Edson R. Sunderland, and John H. Wigmore.

In the case at bar the entries were made in the books from various data—telegrams, letters, statements. These data were furnished largely by persons who made the sales, agents of defendant as well as of plaintiff. Some were furnished by the several freezing establishments. The entries were made in the usual course of business by bookkeepers, who testified that the data were correctly entered. These bookkeepers were agents of both parties. All of the transactions were under the supervision of an agent of defendant. The books of account were originally kept at Christiana; they were subsequently brought to Chicago, and were produced at the trial in Arkansas. The persons who had furnished the original data from which the entries in the books were made were not available as witnesses.

Under all these circumstances we think the court was justified in finding the existence upon the record of the two elements requisite to the introduction of the books of account in question; viz. necessity, and circumstantial guaranty of trustworthiness. We conclude that there was no error in admitting in evidence the books of account, the summaries, the expense vouchers, and the testimony of the witnesses McLeod and Brink.

### The Report of the Auditor.

[5] At the time the auditor was appointed, there had been 17 suits consolidated for trial. The order of appointment authorized the auditor to hear testimony, determine what issues were admitted, and what in dispute, to make findings, computations, etc., if anything was found due the plaintiff, to apportion the amount among the various defendants—all "in order to enable him to testify at the trial to a jury of these actions as a witness, and for no other purpose." Later, 2 of the 17 cases were taken from the consolidated cause and reconsolidated for trial. In refusing to admit the report of the auditor in evidence, the court said:

"I don't think the auditor would apply to this one case. At the time the audit was made the court was under the impression that the 18 cases would all be tried as one, and in addition to that it would be necessary to change pounds to kilos and dollars to kronen, and then again kronen to dollars, and of course the jury would be not able to compute it; but now, as the court isn't going to submit to the jury the general verdict, but several interrogatories, and then determine what the entire damage was in kronen, and then the court make the computation, and

for that reason the report ought not to be submitted."

It appears from the record that, in the consolidated case of 17 original cases in which the auditor was appointed, the pleadings were materially different from the pleadings in the 2 cases on trial. It is apparent, also, that the auditor was appointed for the purpose of simplifying the issues in the 17 cases and preparing himself to testify as a witness, but that the court thought that the services of the auditor were not needed on the trial of the 2 consolidated cases. While the power of the court to appoint an auditor in a case of this kind is well settled, it is equally well settled that the report "may be used only if, and so far as, acceptable to the court." Ex parte Peterson, 253 U. S. 300, 312, 40 S. Ct. 543, 547 (64 L. Ed. 919).

We think there was no abuse of discretion in refusing to admit the report in evidence.

### Requests to Charge the Jury.

[6] One of the errors alleged is the refusal of the court to charge that plaintiff failed to furnish to defendant proofs of loss and adjustment, and hence could not maintain action to recover. As above stated, the complaint alleged the furnishing of proofs of loss and full compliance with the terms of the policies; the answer admitted the receipt of the papers, but denied their sufficiency. In August, 1923, defendant made a motion that plaintiff be required to make its complaint more definite and certain in several respects, but did not ask for further or more definite proofs of loss. Furthermore, it appeared on the trial that defendant had retained the documents sent by plaintiff and purporting to be proofs of loss, and had never notified plaintiff of any defects therein, or insufficiency thereof, until after suit was brought. The court ruled that, under the circumstances, the defendant was estopped to question the sufficiency of the documents furnished. In this we think the court was correct. 38 C. J. 1161, § 473; Taber v. China Mut. Ins. Co., 131 Mass. 239, 253; Palmer v. Great Western Ins. Co., 10 Misc. Rep. 167, 30 N. Y. S. 1044, affirmed 153 N. Y. 660, 48 N. E. 1106. See, also, 26 C. J. 398, § 513; Scottish, etc., Co. v. McKone, 227 F. 813 (C. C. A. 8); Hamilton v. Ins. Co. (C. C.) 46 F. 42, 46, affirmed (C. C. A.) 59 F. 258.

It is also contended that it was error to refuse an instruction requested by defendant that no recovery could be had on account of any damage to the meat by smoke, since

no such claim was submitted to Lloyd's agent, and since an employé of plaintiff had agreed with Lloyd's agent that there was no damage by smoke. We think the refusal was without error, first, because there was no showing that the employé in question had any authority to make any claim to Lloyd's agent, or to waive the making of any claim; second, two of the reports made by Lloyd's agent do mention smoke, the second report saying that the whole cargo had got the reputation of being damaged by fire, smoke, and water, and the third report (made after the alleged talk with said employé of plaintiff) saying that dark patches on some of the meat had been found, and that they were in his (Lloyd's agent's) opinion caused by the smoke and heat. The defendant, therefore, had ample notice that smoke was an element of damage.

A number of other requested charges were submitted by defendant. It is not necessary to discuss them in detail. It is sufficient to say that we have carefully considered them, and are of the opinion that, in so far as they were meritorious and applicable, they were covered by the charge of the court as given. Furthermore, at the close of the charge to the jury, the court, in order to assist the jury, gave them the following statement which he had prepared:

"Amount sued for by plaintiff, $581,016.14=2,376,356 kronen.

"Amount admitted by the defendant as damage to the insured meat by the fires, $28,331.29=115,875 kronen.

"There was sold in Sweden and Denmark 1,250,196.93 kilos, for 2,284,656.02 kronen.

"Expenses to sell it incurred, 465,921.48 kronen.

"Leaving net amount, 1,818,734.54 kronen.

"There were 162,175 kilos, sold in Germany, which netted, after deducting the expenses necessary to sell it, including transportation, 117,908.23 kronen.

"Total amount realized by plaintiff, after deducting expenses, 1,936,642.77 kronen.

"All of these amounts are undisputed, and were submitted to counsel for both parties and agreed on as correct, so far as the figures are set out."

This statement, which both parties conceded to be correct, eliminates a number of points raised by defendant, and renders unnecessary a discussion of them.

Other questions raised by the specifications of error have been examined and considered, but do not require special mention.

Judgment affirmed.