**HARTFORD FIRE INS. CO. v. EMPIRE COAL MIN. CO. \***

Circuit Court of Appeals, Eighth Circuit.
January 16, 1929.

No. 7958.

Clarence G. Myers, of Chicago, Ill. (Myers & Snerly, of Chicago, Ill., and Richard F. Ryan, of Denver, Colo., on the brief), for plaintiff in error.

George L. Nye, of Denver, Colo. (John Pershing, of Denver, Colo., on the brief), for defendant in error.

Before BOOTH and COTTERAL, Circuit Judges, and REEVES, District Judge.

BOOTH, Circuit Judge. This is a writ of error to a judgment entered after verdict in favor of defendant in error, plaintiff below. The suit was commenced in the state district court for the city and county of Denver, Colo., and was thereafter duly removed to the United States District Court for the District of Colorado on the grounds of diversity of citizenship and requisite amount involved.

The action was upon a policy of insurance issued by plaintiff in error covering certain risks in connection with plaintiff's mining property in Las Animas county, Colo. The parties will be designated as in the court below.

The assignments of error, forty-four in number, may be grouped (after elimination of those purporting to cover matters not subject to review, and those which are too general to call for examination), around the following topics: (1) Construction of the policy; (2) underground explosion as the cause of loss; (3) sufficiency of papers purporting to be proofs of loss; (4) sufficiency of the evidence as to amount of loss.

The policy of insurance, so far as here material, is set out in the margin.[1]

[1] Riot and Civil Commotion Policy.

No. R8896

Hartford Fire Insurance Company
Hartford                    Connecticut

The Hartford Fire Insurance Co. Hartford, Conn.

(Amount, $46,500.00 Rate .18 & .665 Premium, $183.45)

In consideration of the Stipulations herein named and of One Hundred Eighty Three and 45/100 Dollars Premium, Does insure Empire Coal Mining Company for the term of One Year from the 18th day of December 1924, at noon, to the 18th day of December, 1925, at noon, against all direct loss or damage caused by any of the following:

(1) Riot; (2) Riot attending a strike; (3) Insurrection; (4) Civil Commotion; (5) Explosion occurring from causes other than above described (excluding fire resulting from such explosion) whether originating on the premises of the assured or elsewhere, except as hereinafter provided, to an amount not exceeding Forty Six Thousand Five Hundred & No/100 Dollars, to the following described property while located and contained as described herein, and not elsewhere, to-wit:

Empire Coal Mining Company.

$46,500.00. On all buildings, including chimneys and on the contents (except as either excluded herein or in the printed conditions of this policy) thereof or therein and all other property usual to a mining operation situated on premises leased or owned by assured on South ½ of the N. E. ¼ of the S. E. ¼ of Section 28, and a portion of the W. ½ of the S. W. ¼ of Section 27, Township 30 South, range 65 West, Las Animas County, Colorado.

It is a condition of this insurance that this policy does not cover in the foregoing paragraph, or except as hereinafter provided, property in mines or shafts below the surface of the ground, nor shall this Company be liable for loss or damage to buildings and equipment, except as hereinafter provided, as a result of any explosion occurring in the underground workings.

It is warranted by the assured that no explosives will be stored in or within 200 feet of any building or structure insured under this policy.

$15,000.00—This insurance being as hereinabove provided, against only direct loss or damage in consideration of $90.75 included in the above mentioned premium of $183.45, this Company also assumes liability for the actual loss sustained but not exceeding $15,000.00 additional to $46,500.00 above mentioned for any consequential loss or damage to the underground workings and equipment by reason of the flooding or partial flooding of the mine, together with the cost of pumping to the surface of the water accumulated because of the inability of the assured to maintain pumping service due to the perils insured against under this policy and this Company also assumes the $15,000.00 additional liability for any loss or damage to the underground workings and equipment and ven-

796

## Construction of the Policy.

■ The particular clause of the policy under which recovery is claimed reads as follows: " * * * And this Company also assumes the $15,000.00 additional liability for any loss or damage to the underground workings and equipment and ventilating fans and for the expense of pumping to the surface the water accumulated by reason of the inability of the assured to maintain pumping service due to an underground explosion."

The construction of this clause contended

for by defendant is thus stated by its counsel: "The policy or contract of insurance only covered and insured the plaintiff against loss and damage, if any, suffered by the plaintiff to the underground workings, equipment and ventilating fans caused by the inability of the plaintiff to maintain pumping service due to an underground explosion, and for the cost of pumping to the surface any water that accumulated on account of the inability of the plaintiff to maintain said pumping service due to an underground explosion."

---

tilating fans and for the expense of pumping to the surface the water accumulated by reason of the inability of the assured to maintain pumping service due to an underground explosion.

\* \* \* \* \* \* \* \*

### Inherent Hazard Clause.

This policy is hereby amended to include all direct loss or damage caused by explosion (excluding fire damage resulting from such explosion) originating from any materials or processes incident to the business of the assured, or of the tenants occupying the buildings or premises described herein; subject in every respect, however, to all the limitations and conditions of this policy.

\* \* \* \* \* \* \* \*

### Reduced Rate Contribution Clause

(For Use on Either Fire or Tornado Policies)

In consideration of the rate at (and) or form under which this policy is written, it is expressly stipulated and made a condition of this contract, that this company shall be held liable for no greater proportion of any loss than the amount hereby insured bears to 100% of the actual cash value of the property described herein at the time when such loss shall happen; but if the total insurance upon such property exceeds 100% at the time of such loss, then this company shall only be liable for the proportion which the sum hereby insured bears to such total insurance, not exceeding the actual amount of loss to the property insured.

If this policy be divided into two or more items, the foregoing conditions shall apply to each item separately.

\* \* \* \* \* \* \* \*

This policy is made and accepted subject to the foregoing stipulations and conditions, and to the following stipulations and conditions printed on the back hereof, which are hereby specially referred to and made a part of this policy, together with such other provisions, agreements or conditions as may be endorsed hereon or added hereto and no officer, agent or other representative of this company shall have power to waive or to be deemed or held to have waived such provision or conditions unless such waiver, if any, shall be written upon or attached hereto, nor shall any privilege or permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached.

\* \* \* \* \* \* \* \*

If loss occur the insured shall give immediate notice in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article and the amount claimed thereon; and within sixty days after the loss, unless such time is extended in writing by this company, shall render a statement to this company, signed and sworn to by said insured, stating the knowledge and belief of the insured as to time and origin of the loss; the interest of the insured and of all others in the property; the cash value of each item thereof and the amount of loss thereon; all incumbrances thereon; all other insurance, whether valid or not, covering any of said property; and a copy of all the descriptions and schedules in all policies; any changes in the title, use, occupation, location, possession, or exposure of said property since the issuing of this policy; by whom and for what purpose any building or other property herein described and the several parts thereof were occupied at the time of loss; and shall furnish, if required, verified plans and specifications of any buildings, fixtures, or machinery or other property destroyed or damaged.

The insured, as often as required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and prescribe the same; and as often as required, shall produce for examination all books of account, bills, invoices, and other vouchers, or certified copies thereof if originals are lost, at such reasonable place as may be designated by this company or its representative, and shall permit extracts and copies thereof to be made.

\* \* \* \* \* \* \*

This company shall not be held to have waived any provision or condition of this policy or any forfeiture thereof by any requirement, act, or proceeding on its part relating to the appraisal or to any examination herein provided for; and the loss shall not become payable until sixty days after the notice, ascertainment, estimate, and satisfactory proof of the loss herein required have been received by this company, including an award by appraisers when appraisal has been required.

\* \* \* \* \* \* \* \*

No suit or action on this policy, for the recovery of any claim, shall be sustainable in any court of law or equity unless all the requirements of this policy shall have been complied with, nor unless commenced within twelve months next after the loss.

In other words, it is contended that the liability under the clause quoted related to three items of loss and damage, viz., to underground workings, equipment, ventilating fans; and to one item of costs, viz., cost of pumping to the surface accumulated water; and it is further contended that all four items must have been caused by the inability of the plaintiff to maintain pumping service; and, finally, that this inability to maintain pumping service must have been due to an underground explosion.

On the other hand, the contention of plaintiff is that the liability under the clause quoted from the policy related to the same three items of loss and damage and the one item of cost of pumping; but that the first three items were subject to the single condition, "due to an underground explosion," whereas the last item, "cost of pumping," was subject to the double condition, "inability to maintain pumping service due to an underground explosion."

In determining the proper construction to be given to the clause in question, resort may be had to the other provisions of the policy. The face of the policy consists of two parts: First, a printed form; second, a typewritten rider which, after giving a description of the property, goes on to say: "It is a condition of this insurance that this policy does not cover in the foregoing paragraph, or except as hereinafter provided, property in mines or shafts below the surface of the ground, nor shall this Company be liable for loss or damage to buildings and equipment, except as hereinafter provided, as a result of any explosion occurring in the underground workings." There follows a provision prohibiting the storage of explosives; and then come the two special $15,000 risk clauses.

It is thus seen that the printed form of the policy did not cover (1) Property in mines or shafts below the surface of the ground; (2) loss or damage resulting from an underground explosion. The two special risk clauses in the rider covered these two matters respectively. Each of these two special risk clauses covered items of property loss, and each covered the item of cost of pumping to the surface accumulated water. The coverage of this expense item of pumping was dependent in both clauses upon the same condition, viz., inability to maintain the pumping service at the mine. The attaching of this condition to the expense item of pumping was quite natural. But in our opinion it would be unnatural to attach this condition to the items of loss and damage to property. Items of loss and damage to property by un-

derground explosion might well occur whether the pumping service of the mine was maintained or not; and, if they could occur without regard to whether pumping service was maintained, it would seem unnatural and unlikely that they should be included in the coverage in the one instance and not in the other. In other words, we think that the insurance which covered property loss and damage under the clause in question was against underground explosion, not against inability to maintain pumping service. The expense incident to the inability to maintain pumping service because of underground explosion was a separate item of coverage.

The foregoing construction in our opinion is in accord with the language used in the clause in question, and in accord with the intention of the parties as disclosed by other provisions in the policy. It furthermore does not require any interpolation of words as does the construction contended for by defendant.

It is argued by counsel for defendant that, since loss by fire resulting from explosion above ground was excluded by the terms of the policy, it is unreasonable to hold that there was an intention to cover loss by fire resulting from an underground explosion. We fail to see the force of this argument. On the contrary, the fact that the policy by express language excluded loss by fire resulting from an explosion above ground, and the further fact that the policy did not by similar language exclude loss by fire resulting from an explosion underground, would seem to indicate an intention to cover loss by fire resulting from an explosion underground. Furthermore, the two fires which might be thus caused would differ very materially as to their being accessible by ordinary fire fighting apparatus; and for this reason, among others, they might well be treated differently as regards insurance. We think the construction placed upon the policy by the trial court was correct.

### Underground Explosion as the Cause of Loss.

The term "explosion" has a varied meaning. Webster's Dictionary defines it as "a violent bursting or expansion, with noise, following the sudden production of great pressure, as in the case of explosives, or a sudden release of pressure, as in the disruption of a steam boiler."

Century Dictionary defines it as "a sudden expansion of a substance, as gunpowder or an elastic fluid, with force and usually a loud report; a sudden and loud discharge."

The New English Dictionary (Oxford)

gives this definition, "of a gas, gunpowder, etc.: the action of 'going off' with a loud noise under the influence of suddenly developed internal energy."

New International Encyc. vol. VII, p. 373 (D. M. & Co. '05), states: "The development of an explosion may often be explained as resulting from the transformation of a shock into heat. This may be accomplished by the propagation of the shock from particle to particle in an explosive, or by a shock from one explosive body to another not in direct contact."

In United Life Fire & Marine Ins. Co. v. Foote, 22 Ohio St. 340, 348, 10 Am. Rep. 735, it was said: "An explosion may be described generally, as a sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report. But the rapidity of the combustion, the violence of the expansion, and the vehemence of the report, vary in intensity as often as the occurrences multiply. Hence, an explosion is an idea of degrees, and the true meaning of the word, in each particular case, must be settled, not by any fixed standard, or accurate measurement, but by the common experience and notions of men in matters of that sort."

In Trans. F. Ins. Co. v. Dorsey, 56 Md. 70, 81, 40 Am. Rep. 403, it was said: "An explosion, produced by ignition, according to common understanding, may be accurately enough described, for practical purposes, as a sudden and rapid combustion, causing a violent expansion of the air, and producing a report more or less loud, according to the resistance offered. That it greatly varies in its degrees of violence, and the effects produced, are facts fully within the experience of every one. We must suppose that the term was employed in the policy in its ordinary and popular meaning."

In Mitchell v. Potomac Ins. Co., 16 App. D. C. 241, 270, it was said, quoting from the Dorsey Case, supra: " * * * An explosion * * * according to common understanding, may be accurately enough described for practical purposes as a sudden and rapid combustion causing a violent expansion of the air and producing a report more or less loud."

In Vorse v. Jersey Plate Glass Ins. Co., 119 Iowa, 555, 557, 93 N. W. 569, 570 (60 L. R. A. 838, 97 Am. St. Rep. 330) it was said: "The term 'explosion' has no fixed and definite meaning either in ordinary speech or in law. It may be described, in a general way, as sudden and rapid combustion, causing violent expansion of the air, and accompanied by a report. It may and does vary in degrees of intensity and in the vehemence of the report, and it is not always due to the presence of fire. Indeed, it may result from decomposition or chemical action."

Corpus Juris (volume 25, pp. 178, 179) says: "When produced by ignition, according to common understanding, it may be accurately enough described for practical purposes as a sudden and rapid combustion causing a violent expansion of the air and producing a report more or less loud according to the resistance offered."

From these various definitions or descriptions we may conclude that the usual elements characteristic of an explosion are: Sudden and rapid combustion; sudden and great expansion of air; a sharp noise or report.

In the case at bar the court in its charge to the jury said: "An explosion is hard to define. General characteristics may be described, but the exact facts which constitute what we call an explosion are not susceptible of such statement as would always distinguish such an occurrence. Explosion varies in degrees of intensity; in the vehemence of the report; the rapidity of the combustion; the violence of the expansion. The vehemence of the reports vary in intensity as often as the occurrences multiply. Hence an explosion is an idea of degrees, and the true meaning of the word in each particular case must be settled, not by any fixed standard, or accurate measurement, but by the common experience and notions of men in matters of that sort. The term is to be construed in its popular sense, and as understood by ordinary men, and not by scientific men. It may be described in general as a sudden and rapid combustion, causing a violent expansion of the air, and accompanied by a report."

The court further charged on this subject: "Now, first, you must find out and determine whether there was an explosion or not. If you find by a preponderance of the evidence that there was not an explosion in this mine immediately preceding this fire, or that an explosion was not the proximate and direct cause of the damage the plaintiff claims, then, of course, you must find a verdict for the defendant, irrespective of whether there was a fire there or not. Further than that, you must find that the explosion, if any, was caused by the explosion or ignition of a gaseous mixture as plaintiff claims and supports by its testimony. Of course, an explosion presupposes, first, the presence in the mine of a gaseous mixture of the composition that has been testified to, and next, the ignition or setting

off of that mixture by some agency such as a spark, fire or other cause, or phenomenon that would cause the resulting explosion."

And again: "You are further instructed that if you believe from a preponderance of the evidence that the fire in question was caused by the ignition of a pocket of gas, and that the ignition was not accompanied with force and violence, but simply started as an ordinary fire, that would not be an explosion covered by the policy, and the defendant would not be liable in such case. In other words, gentlemen, there was some evidence there, as I recall, that gas was seeping into this mine more or less all the time. If that gas simply began to burn and did not explode, and caused the ignition of the coal, and the resulting fire, that would not be an explosion as defined in the policy."

We think these instructions as applied to the evidence in the case at bar were correct and sufficiently informed the jury how to determine from the evidence whether there was an explosion, and whether it, through the resulting fire, was the cause of the loss and damage suffered by plaintiff.

But it is contended that there was no evidence from which the jury could legitimately conclude that there had been an explosion. It is true that no one testified to being present and witnessing an explosion. Circumstantial evidence, however, is competent and may be convincing. There was evidence tending to show that the mine was a gaseous mine; that the gas was of the kind known as methane, and was of an explosive nature when mixed with a proper proportion of air; that this gas seeped through the sandstone roof of the mine and also through the cracks in the coal seam; that at times it would gather along the roof of the mine; that the gaseous mixture could be set off in various ways, as by a lighted match, a spark, an electric arc; that there were electric wires strung in the mine, electricity being used for lighting and other purposes; that these wires were strung a few inches from the roof on wooden posts; that sometimes a rock would fall from the roof and break a wire; that when a wire parted it would cause a flame; that a broken wire coming into contact with the ground or a rail would cause a spark.

There was also evidence tending to prove that the explosion, if there was one, happened after the shift left work about 4 o'clock in the afternoon of March 25, 1925, and 3 o'clock in the morning of March 26th, when the fire boss of the mine made his usual inspection; that he had inspected the mine on the 25th and had found no pockets of accumulated gas; that when the men quit work on the afternoon of the 25th a small pump was left in operation in the mine, but no one was in attendance inside the mine; that when the fire boss entered the mine on the morning of the 26th he discovered dense smoke at a point some distance within the mine; that he could not see the fire on account of the smoke; that the electric lights in the mine were burning when he entered the mine, but that they shortly went out; that the system used was a three-phase circuit; that the electric motors could not run after one of the wires was broken, but the lights could burn on a two-phase circuit; that several times during the 26th the fire boss and others, including the state mine inspector, entered the mine, but did not get to the fire because of the smoke and heat; that either that night or early the next morning the smoke receded 300 or 400 feet so that the fire could be seen; that the fire was very hot and extended on both sides of the mine a distance of 300 or 400 feet; that it was burning in the side entries as well as in the main slopes; that at one place the fire had jumped, or rather had started, in a new place, leaving an intervening space of 200 to 250 feet unburned. There was in evidence the opinion of an experienced mine inspector that the intense heat had set fire to some oil on the floor at this new place. There was also evidence tending to prove that, at the time the fire was discovered, air was being forced into the mine at the rate of about 20,000 cubic feet per minute; that the fire and the smoke in front of the fire were making headway against this current of air; that the smoke had traveled about 700 feet and the fire about 300 to 400 feet against this current of air. There was evidence tending to prove that the flame of an ordinary fire travels with the current of air; but that the flame of a fire caused by an explosion of gas in a mine travels against the current of air; and that the forcing of smoke against an air current was also characteristic of an explosion of gas which produced a fire.

On the other hand, there was no substantial evidence of violence in connection with the explosion, if there was an explosion; but there was opinion testimony by witnesses of long experience in connection with this and other mines tending to show that extreme violence was not a necessary accompaniment of a gas explosion in a mine.

There was also testimony tending to show that the following was a correct description of mine explosions: "An important phenomenon attending nearly all mine explosions is the transmission of the flame of the initial

explosion to other parts of the mine, igniting other bodies of gas, and propagating throughout the mine what would otherwise have been a local explosion. The manner and the distance the flame of an explosion is transmitted will depend on the amount and composition of the explosive mixture and on numerous conditions with respect to the air-current and the mine entries and workings. The flame may advance at a moderate velocity, quietly sweeping the roof of the passages, or as a wild rush of fire filling the entire entry with flame, dust, and debris, propelled at a high velocity by the explosive energy. The path traversed by the flame is frequently a haulage road in preference to other passageways, which may be explained by the fact that the powdered coal and dust of the haulage road feed the flame of the explosion. On the other hand, an explosion may pass by a dry, dusty heading and advance for a long distance over a wet haulage road, for reason, probably, that the supply of fresh air needed to propagate the explosion, as well as a large quantity of fine coal, is found along the haulage road. In general, it may be said that the question of air supply determines very largely the course of the explosion, since the oxygen of the air is necessary for the combustion that takes place."

There was testimony by the state coal mine inspector that he had never seen a fire gain so much headway as this fire did in the same length of time.

There was evidence tending to show that the coal in the mine was a steam coal of hard character, slow burning, and difficult to ignite; that there was but little timber in the mine.

There was opinion testimony by men of long experience with mines that this fire, which was discovered on the morning of March 26th, was not a fire that was produced in the ordinary way, but was a fire of the character that could have been produced by an explosion of gas.

There was evidence that the fire was fought by men working in three shifts for twenty-three or twenty-four days, and was finally subdued by sealing off a portion of the mine.

■ It is contended by counsel for defendant that it was error to allow opinion or expert testimony to be given on the question of explosion; but there is no hard and fast rule governing the allowance of such testimony. The matter is one left largely to the sound discretion of the trial judge.

In United States Smelting Co. v. Parry, 166 F. 407, 410, 411, this court, speaking by Judge Van Devanter, now Mr. Justice Van Devanter, said:

"The matter next to be considered is the admission, over the defendant's objection, of testimony by a practical brick mason and builder of many years' experience to the effect that a scaffold constructed and supported like the one in question was not as safe as those usually provided in like situations, but was very dangerous, because the weight of a man upon the projecting end of one of the planks was sure to make it tip. The objection made was, not that the witness was not qualified to speak as an expert, but that his opinion was elicited upon a matter which it was the province of the jury to decide, and which they were capable of deciding without such testimony. It is true that in trials by jury it is their province to determine the ultimate facts, and that the general rule is that witnesses are permitted to testify to the primary facts within their knowledge, but not to their opinions. And it is also true that this has at times led to the statement that witnesses may not give their opinions upon the ultimate facts which the jury are to decide, because that would supplant their judgment and usurp their province. But such a statement is not to be taken literally. It but reflects the general rule, which is subject to important qualifications, and never was intended to close any reasonable avenue to the truth in the investigation of questions of fact. Besides, the tendency of modern decisions is not only to give as wide a scope as is reasonably possible to the investigation of such questions, but also to accord to the trial judge a certain discretion in determining what testimony has a tendency to establish the ultimate facts, and to disturb his decision admitting testimony of that character only when it plainly appears that the testimony had no legitimate bearing upon the questions at issue and was calculated to prejudice the minds of the jurors. Holmes v. Goldsmith, 147 U. S. 150, 164, 13 S. Ct. 288, 37 L. Ed. 118; Williamson v. United States, 207 U. S. 425, 451, 28 S. Ct. 163, 52 L. Ed. 278; Alexander v. United States, 138 U. S. 353, 356, 11 S. Ct. 350, 34 L. Ed. 954; Moore v. United States, 150 U. S. 57, 60, 14 S. Ct. 26, 37 L. Ed. 996; Clune v. United States, 159 U. S. 590, 592, 16 S. Ct. 125, 40 L. Ed. 269. And it is in keeping with this modern tendency that it is now generally held, as stated in Chicago Great Western Ry. Co. v. McDonough (C. C. A.) 161 F. 657, 662, and in the cases there cited, that whether or not a witness tendered as an expert is qualified to testify as such rests largely in the discretion of the trial judge, and that his de-

cision thereon ought not to be disturbed, unless it can be said that it was manifestly erroneous.

"The most important qualification of the general rule before stated is that which permits a witness possessed of special training, experience, or observation, in respect of the matter under investigation, to testify to his opinion when it will tend to aid the jury in reaching a correct conclusion; the true test being, not the total dependence of the jury upon such testimony, but their inability to judge for themselves as well as is the witness."

These rules have been followed in this court in numerous cases: Central Coal & Coke Co. v. Williams, 173 F. 337; C. R. I. & P. Ry. Co. v. Hale, 176 F. 71; Kansas City So. Ry. Co. v. Rogers, 203 F. 462; Gillespie v. Collier, 224 F. 298; Omaha, etc., Ry. Co. v. McKeeman, 250 F. 386; Laughlin v. Christensen, 1 F.(2d) 215.

We find no abuse of discretion in the rulings of the trial judge in the case at bar relative to the admission or rejection of opinion testimony.

It is further contended by counsel for defendant that the jury could not have reached the conclusion that there was an explosion without basing presumption upon presumption, and that this is not allowable. The rule cited is well established, but we think it is not applicable to the case at bar. The contention of counsel confuses the question, was the fire caused by an explosion? with the entirely different question, in what particular way was the explosion caused? It was incumbent on the plaintiff to prove the affirmative of the former question. No burden rested upon the plaintiff to answer the latter question. The answer to the second question might involve not only numerous facts, but also several presumptions. The answer to the first question involved a single inference from numerous established facts.

In view of all the evidence, we think that the question whether an underground explosion caused the fire was for the jury to determine; that the question was properly submitted to them; and that the verdict was supported by substantial evidence.

### The Proofs of Loss.

The policy provided: "If loss occur the insured shall give immediate notice in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, make a complete inventory of the same, stating the quantity and cost of each article and the amount claimed thereon; and within sixty days after the loss, unless such time is extended in writing by this company, shall render a statement to this company, signed and sworn to by said insured, stating the knowledge and belief of the insured as to time and origin of the loss; the interest of the insured and of all others in the property; the cash value of each item thereof and the amount of loss thereon; all incumbrances thereon; all other insurance, whether valid or not, covering any of said property; and a copy of all the descriptions and schedules in all policies; any changes in the title, use, occupation, location, possession, or exposure of said property since the issuing of this policy; by whom and for what purpose any building or other property herein described and the several parts thereof were occupied at the time of loss; and shall furnish, if required, verified plans and specifications of any buildings, fixtures, or machinery or other property destroyed or damaged."

It is not claimed that timely notice of a loss was not given, but that the statement which was furnished did not fulfill the requisites mentioned in the policy. The fire occurred March 26, 1925. Notice of loss was given March 30th; and within the 60 days a "statement" was furnished. The statement gave the time and place of the loss, the ownership of the property, the cause of the loss, the extent of the loss, and the amount claimed. It gave the amount already paid out in repairing the loss and the probable additional amount still to be paid. The statement also contained the following: "Any other information that may be required will be furnished on call, and considered a portion of these proofs."

After the suit was brought, a bill of particulars was demanded by the insurance company and furnished by the insured. It is apparent from this bill of particulars and from the evidence in the case that the furnishing of a complete inventory of the property, stating the quantity and cost of each article, and the amount claimed thereon, would not meet the existing situation. An inventory was evidently intended to be required where there were many separate items of property damaged or destroyed. Here there were very few items of such property; the greater items of loss and damage were for labor in putting out the fire and in cleaning up the falls of rock due to the explosion and the fire. Such items would not properly appear in an inventory. The trial court in the end eliminated all questions of the sufficiency of

the proofs of loss, by instructing the jury that proper proofs were furnished. Whether this instruction was technically correct, in view of the evidence, we need not determine; but in any event we think that the question of sufficiency of the proofs of loss was properly eliminated from the deliberation of the jury for the following reasons: The proofs of loss which were furnished were retained by the defendant company for about seven weeks, and then returned with a denial of any liability. That this position of denying any liability had been taken by the company before the proofs of loss were furnished is indicated by the fact that it refused to comply with plaintiff's request for blanks on which to make the proofs of loss. Under the evidence disclosed by the record, we think that the defendant, both by retaining the proofs of loss for an unreasonable length of time and by denial of any liability under the policy, waived the defense that proper proofs of loss were not furnished, and that the question was properly eliminated from the case.

■ It is insisted by counsel for defendant that there could be no waiver of the failure to furnish proper proofs of loss unless such waiver was indorsed upon the policy, since it was provided in the policy that no officer, agent, or representative of the company should have power to waive any provision or condition unless such waiver was in writing and attached to the policy. The case of Scottish Union, etc., Ins. Co. v. Encampment Smelting Co., 166 F. 231 (C. C. A. 8), is cited and relied upon as holding such a provision in the policy valid and applicable to proofs of loss, and as holding further that where such provision had not been complied with suit on the policy could not be maintained.

Though the ruling in that case is contrary to the rulings in several of the other circuits, yet we are not disposed to question its correctness at this time, inasmuch as we think it does not in any event control the case at bar. Neither in that case, nor in any of the cases cited by defendant on the same point, had there been retention of proofs of loss by the insurance company for an unreasonable length of time; in fact, no proofs of loss had been furnished within the specified time. In the case at bar proofs of loss had been furnished within the required time. Conceding, but without deciding, that they were defective, yet the company could not retain them for an unreasonable length of time and then return them with a denial of all liability without waiving the defects, if such existed; and so the authorities hold.

33 C. J. 27, 32, §§ 686, 694; 26 C. J. 398, § 513; 38 C. J. 1161, § 473; St. P. F. & M. Ins. Co. v. American Food Prod. Co., 21 F.(2d) 733, 739 (C. C. A. 8); Royal Ins. Co. v. Martin, 192 U. S. 149, 162, 24 S. Ct. 247, 48 L. Ed. 385; Knickerbocker Life Ins. Co. v. Pendleton, 112 U. S. 696, 709, 5 S. Ct. 314, 28 L. Ed. 866; Cont. Ins. Co. v. Fortner (C. C. A.) 25 F.(2d) 398; Prudential Ins. Co. of Am. v. Stewart (C. C. A.) 286 F. 321; American M. Marine Ins. Co. v. Margaret M. Ford Corp. (C. C. A.) 269 F. 768; Twin City F. Ins. Co. v. Stockmen's Nat. Bank (C. C. A.) 261 F. 470; Citizens' Trust & G. Co. v. Globe & Rutgers F. Ins. Co. (C. C. A.) 229 F. 326, Ann. Cas. 1917C, 416; Scottish Un. & Nat. Ins. Co. v. McKone, 227 F. 813 (C. C. A. 8); Hamilton v. Conn. Fire Ins. Co. (C. C.) 46 F. 42, 46, affirmed (C. C. A.) 59 F. 258; Taber v. China Mut. Ins. Co., 131 Mass. 239, 253; Palmer v. Great Western Ins. Co., 10 Misc. Rep. 167, 30 N. Y. S. 1044, affirmed 153 N. Y. 660, 48 N. E. 1106.

### The Evidence as to Amount of Loss.

■ It is the contention of defendant that the reduced rate contribution clause governed the method of determining the amount of loss and damage recoverable under the policy, and that there was no evidence which enabled this method to be used. In other words, defendant contends that only such proportionate part of the loss could be recovered as $15,000 bore to the total value of all the underground workings, equipment, and ventilating fans in plaintiff's mine. We think the clause referred to is not applicable to the situation in the case at bar. Such a clause has reference to items of property insured which were capable of inventory and valuation before the loss occurred, and capable of inventory and valuation after the loss occurred. In the case at bar the three items, cost of extinguishing the fire, cost of cleaning up the fallen rock, cost of pumping out accumulated water, could not fairly be said to be subject to the rule contended for. Yet these three items amounted to more than $15,000, the amount of the insurance. And it is not claimed by defendant that by such expenditures the property insured was rendered more valuable than before the explosion, or that they were not prudently incurred. The action taken by the plaintiff was provided for in the policy, and was incumbent upon plaintiff. Such items were proven by competent evidence, which included copies of entries made in the regular books of account of plaintiff which were kept in

the regular course of business; the production of the books themselves with proof of their authenticity and correctness being expressly waived. We think the items were within the coverage, which extended to "any loss or damage to the underground workings and equipment and ventilating fans and for the expense of pumping to the surface the water accumulated by reason of the inability of the assured to maintain pumping service due to an underground explosion." 1 Phillips, Ins. pp. 645, 646; Cooley's Briefs on Ins., vol. IV, pp. 3065, 3071; Thornton v. Security Ins. Co. (C. C.) 117 F. 773; Holtzman v. Franklin Ins. Co., Fed. Cas. No. 6649; Ins. Co. of North Am. v. Leader, 121 Ga. 260, 265, 48 S. E. 972; Case v. Hartford Fire Ins. Co., 13 Ill. 676; White v. Republic, etc. Ins. Co., 57 Me. 91, 2 Am. Rep. 22; Scripture v. Lowell Mut. Fire Ins. Co., 10 Cush. (Mass.) 356, 365, 57 Am. Dec. 111; Eliot Five Cents Sav. Bank v. Commonwealth Assur. Co., 142 Mass. 142, 146, 7 N. E. 550; Brady v. N. W. Ins. Co., 11 Mich. 425; First Nat. Bank v. Ger. Am. Ins. Co., 23 N. D. 139, 134 N. W. 873, 38 L. R. A. (N. S.) 213; Clover v. Greenwich Ins. Co., 101 N. Y. 277, 4 N. E. 724.

Other questions raised by the assignments of error have been examined, but they do not require discussion. We find no reversible error in the record, and the judgment is affirmed.