**JULIUS HYMAN & COMPANY, a corporation (now Shell Chemical Corporation), Plaintiff,**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY, a corporation, Defendant.**

Civ. No. 4282.

United States District Court
D. Colorado.

Dec. 28, 1955.

Robert P. Davison, William C. Mc-Clearn, Peter H. Dominick (of Holland & Hart), Denver, Colo., Carney W. Mimms, New York City, for plaintiff.

Lowell White and Walter A. Steele (of White & Steele), Denver, Colo., for defendant.

CHRISTENSON, District Judge.

Plaintiff seeks to recover, under a boiler and machinery insurance policy issued to it by the defendant company, for loss resulting from a "leak", "rupture", or "explosion" of a pipe in a Dowtherm boiler.

How, among these possibilities, the occurrence which caused plaintiff's loss can be legally characterized, will determine whether the plaintiff should recover its full claim, one-half of it, or nothing at all. Each side, as it were, walks a tightrope between these possibilities, since plaintiff contends that the occurrence was sufficiently violent to constitute a rupture rather than a leak, but not sufficiently violent to constitute an explosion as distinguished from a rupture, while defendant contends that either the occurrence involved so little violence as to be merely a gradually developing leak, or that it was of such excessively violent nature as to be an explosion.

Despite differences between the parties in connection with discovery processes, see Julius Hyman & Co. v. Amer-

ican Motorists Insurance Co., D.C., 17 F.R.D. 386, most of the basic facts now are largely without dispute. As to these, as well as to the disputed issues, the Court finds:

During all material times, plaintiff was and is a corporation organized under the laws of the State of Delaware, with a place of business at Rocky Mountain Arsenal, Colorado. Following the loss sued upon herein, Julius Hyman and Company merged with Shell Chemical Corporation, which succeeded to all the rights of Julius Hyman and Company. Defendant was, and is, a corporation organized under the laws of the State of Illinois and authorized to do business in Colorado. The jurisdiction of the Court is unquestioned, since the amount in controversy substantially exceeds $3,000, and the requisite diversity of citizenship is present.

The defendant issued and delivered to plaintiff a certain boiler and machinery insurance policy, No. XM852, and an endorsement thereto, which policy and endorsement were in full force and effect on January 18, 1952, the date of the loss involved in this case. This policy insured plaintiff against such monetary loss as it might sustain from interruption of plaintiff's business caused by "an accident" to an object insured under the policy. By a schedule effective March 16, 1950, and forming a part of this policy, Dowtherm boilers, including the one directly involved here, and other items located on the premises of plaintiff, were specifically added to the objects covered by the policy and endorsement, for which added coverage an additional premium was paid by the plaintiff to the defendant.

Dowtherm is a chemical composition used as a heat transfer medium in boilers and heating systems. This composition permits heating to high temperatures in a low pressure system, as distinguished from the high pressure systems using, for instance, water. The normal temperature in a Dowtherm boiler is approximately 690° to 700° Fahrenheit. With Dowtherm at this temperature the pressure is about 84 to 85 pounds per square inch. Water at the same temperature would produce a pressure of approximately 3,000 pounds per square inch.

While the policy, with endorsements, specifically referred to steam or water as the requisite agency causing damage before the insurer would be liable, and the special schedule including in the coverage "Dowtherm boilers" did not expressly modify the wording of the policy in this respect, it is apparent that the intent of the parties was to include within the definition of an "accident", the action of Dowtherm or Dowtherm vapor in lieu of steam or water, and that the true contract of the parties, as agreed upon at the trial, requires the substitution of "Dowtherm or Dowtherm vapor" in lieu of "steam or water". With this interpolation, the policy contains the following definition of "accident" giving rise to liability under the policy:

"*Definition of Accident.*

"(a) As respects any Object which is designated and described in this Schedule and for which the word 'broad' is inserted in the column headed 'Coverage', 'Accident' shall mean:

"1. A sudden and accidental tearing asunder of the Object, or any part thereof, caused by pressure of steam or water therein, or a sudden and accidental crushing inward of a cylindrical furnace or flue of the Object so caused;

"2. A sudden and accidental cracking of any cast iron part of the Object, if such cracking permits the leakage of steam or water; or

"3. A sudden and accidental burning or bulging of the Object, or any part thereof, which is caused by pressure of steam or water within the Object or which results from a deficiency of steam or water therein and which immediately prevents or makes unsafe the continued use of the Object;

"but 'Accident' shall not mean the cracking of any part of the Object

other than a cast iron part, nor the tearing asunder, burning, bulging or cracking of any safety disk, ruptured diaphragm or fusible plug, or leakage at any valve, fitting, joint or connection."

On January 18, 1952, a Dowtherm boiler covered by said policy went out of operation, causing a shutdown of certain chemical processes in plaintiff's plant and thereby resulting in monetary loss to the plaintiff in the sum of $32,197.74. All conditions precedent to recovery by the plaintiff under the policy and endorsement have been performed by the plaintiff or have occurred, and plaintiff has heretofore demanded payment from the defendant of the loss in the amount above specified, which payment has been refused by the insurer.

The Dowtherm boiler in which the difficulty occurred was a so-called "Wickes" boiler, the circulation tubes of which consisted of steel pipes set vertically one-half inch to one inch apart, and connecting a lower tank, which was a reservoir for liquid Dowtherm, with two upper tanks, referred to as vapor tanks, from which the Dowtherm vapor was transported to another area through pipes.

On the day of the difficulty, no noise was heard, no drop in pressure was observed and nothing else out of the ordinary was noted by the employee attending the boiler until an employee from another area informed him that black smoke was being emitted from the stack above the building. It was then discovered that Dowtherm was escaping from one of the vertical pipes in the boiler. A part of this Dowtherm or Dowtherm vapor was igniting as it fell to the floor of the furnace, with other Dowtherm on the furnace floor apparently burning. The gas supply for the boiler was immediately cut off, and as soon as the temperature of the boiler had decreased enough to permit his entry, an inspector representing the insurance company, saw that there was an opening in the pipe.

In due course, the section of the pipe involved was cut off. Closer examination revealed that the pipe in the area of the split had bulged out and the lips of the split protruded slightly beyond the surface of the bulge proper. The inside of the pipe in the area of the opening was substantially filled with hydrocarbons, mixed with Dowtherm liquid. The opening in the pipe ran lengthwise. It was about one and a half to two inches long, and about three-sixteenths to one-quarter of an inch across at its greatest width, diminishing in width toward each end of the break. While the passage of Dowtherm along that area would have been substantially restricted when the furnace was in operation, due to the presence of carbon, the plugging of the pipe was not sufficiently impervious to preclude the presence under pressure of liquid Dowtherm and Dowtherm vapor at the point of the opening.

The latter point is not without dispute in the evidence, but I further find on the disputed evidence, expert and otherwise, that the cause of the opening was that the pipe in the area of the opening became plugged from the adherence of hydrocarbons on the inside of the pipe and from the accumulation of carbon fragments moving with the liquid Dowtherm until obstructed by the constriction in the pipe. These carbon fragments were probably the result of the partial breakdown of Dowtherm from its being subjected to temperatures in excess of 700°. The restriction in the movement of Dowtherm past the affected portion of the pipe prevented the efficient carrying off of heat. This resulted in excessive heating of the pipe, which in turn reduced its thickness and tensile strength.

█ Contrary to defendant's alternate contention that the opening began as a pinpoint and gradually increased in size over a substantial period of time, I find that when the opening developed, it developed suddenly. The pressure from within, when the strength of the pipe so decreased as not to be able to with-

stand it, split the pipe at its weakest point. Thus was permitted the escape of Dowtherm and Dowtherm vapor, which was ignited when exposed to the flames of the furnace (as observed by the attendant upon first opening the door). I further find that this involved a sudden and accidental tearing asunder of the pipe, as indicated, caused by the pressure of the Dowtherm or Dowtherm vapor therein.

Since clearly the occurrence was an accident within the purview of the policy sued upon, the findings to this point would be dispositive of the case were it not for this situation: An endorsement to the policy provided that "in the event of loss of the kind afforded by this endorsement to which both this insurance and other insurance carried by the insured apply, the company shall be liable under this endorsement for no greater proportion of the loss sustained than the amount hereby insured bears to the whole amount insured thereon." It was agreed between the parties at the pre-trial conference, and confirmed at the trial, that the plaintiff, in addition to the amount of the policy in question, carried substantial amounts of fire insurance with other companies, covering, among other things, the boiler in question. It was further agreed that these other policies covered the risk of "explosion" to the boiler. By further stipulation between the parties, if the occurrence causing plaintiff's damage is determined by the Court to be an "explosion" as well as an "accident", without resort to any precise prorating, I am to award to the plaintiff one-half of its $32,197.74 loss, or the sum of $16,098.87.

Plaintiff has put all its eggs in one basket, it having failed to make any claim against the fire insurance companies on the theory of explosion, so that any recourse against them is now barred. This circumstance accounts for the situation noted at the beginning of this opinion, that plaintiff would have the Court consider the opening of the pipe to have been attended with sufficient violence and suddenness as to constitute a sudden tearing asunder and, therefore, an "accident", and yet with too little violence and noise to constitute an "explosion". The policy provision referred to also explains defendant's position at the trial that either there was no violence or suddenness whatsoever, in which case there would be no liability on its part, or that there was such marked violence and suddenness, with attendant noise, as to constitute an explosion.

I do not believe that plugging of the pipe on both sides of the opening was sufficient to permit abnormal pressure to be built up by the capture and vaporizing of Dowtherm in that limited area. Hence, the force which caused the rupture was the normal pressure expected to be within said pipes, which became excessive only because of the restriction of the free movement of Dowtherm in that area and consequent overheating and weakening of the pipe.

The fire insurance policies were not put in evidence. Both parties indicated that the provision of the policies relating to the risk of explosion would furnish no special guide apart from the meaning ordinarily attached to the word "explosion". In the absence of some stipulated definition, the true meaning of the term in this case must be settled by the common experience and notions of men in matters of that sort, and in the light of adjudications with this meaning in view. The exact line between an explosion and something less is not susceptible of more exact measure or definition. Hartford Fire Insurance Co. v. Empire Coal Mining Co., 8 Cir., 1929, 30 F.2d 794; L. L. Olds Seed Co. v. Commercial Union Assurance Co., 7 Cir., 1950, 179 F.2d 472; Bower v. Aetna Insurance Co., D.C.N.D.Texas, Dallas D., 1944, 54 F.Supp. 897; Mitchell v. Potomac Insurance Co. of Georgetown, 183 U.S. 42, 22 S.Ct. 22, 46 L.Ed. 74; Lever Bros. Co. v. Atlas Assur. Co., 7 Cir., 1942, 131 F.2d 770.

These, and other cases from the State Courts cited by the parties, are helpful; but they do not furnish a controlling answer to our problem. Most of them con-

**834**

sider whether there was any evidence to support a given determination rather than what that determination should have been in the first instance, which is the problem confronting me. In some of them, special policy provisions were looked to, and in some, local statutes were deemed significant. None of them appear determinative on the peculiar facts here. My decision must rest upon the facts, viewed in the light of the principles and reasoning of the cases, and the usual definition of explosion as "a violent bursting, or expansion, with noise, following the sudden production of great pressure, as in the case of explosions, or a sudden release of pressure as in the disruption of a steam boiler; also the noise made by such bursting." Webster's New International Dictionary, 2d Ed.

It must be recognized that as there are various degrees of violence and noise, explosions can be of different kinds or degrees. No single element, or the degree or extent of that element, furnishes the final answer. Yet it also must be recognized that every sudden tearing asunder from pressure from within is not an explosion, and that the term "accident" as defined in the instant policy and "explosion" as commonly understood are not necessarily synonymous. The issue is not free from doubt, but I have determined that plaintiff's damage was not the result of an explosion for the following reasons:

1. There was no proof of any substantial report or noise accompanying the occurrence.

2. The pressure which caused the opening was not an abnormal, sudden or unusual pressure.

3. In at least one sense, no explosion caused the rupture, but the rupture caused whatever "explosion" might otherwise be claimed to have been involved; that is, instead of increase of pressure from within being responsible, the heat applied from without so reduced the tensile strength of the metal that normal pressure from within split the pipe.

4. The action of the pressure from within was wholly expended on the rupture as far as the evidence shows, and there was no external damage or effect of any kind.

5. The dripping of the liquid Dowtherm from the opening as thereafter observed could be explained merely by the force of gravity once the pipe had split.

6. The defendant's alternative argument and evidence that if the occurrence was not an "explosion" there was insufficient suddenness and violence involved to constitute an "accident", does not strengthen the theory of explosion.

7. The section of the tube in which the split occurred was shown to have been delivered to, and received by, responsible officers of the defendant company. The explanation for its non-production by defendant was not satisfactory or convincing, giving rise to a presumption that the evidence would have been unfavorable to defendant. Indications are that in no way were defendant's counsel responsible for such non-production or concealment.

8. Under the peculiar line-up of the present case, the burden to show the occurrence of an explosion preventing the full operation of the policy according to its terms with respect to "accident" should be deemed upon the defendant as an affirmative defense.

9. In the report made to the defendant company by its inspector the occurrence was referred to as a "rupture or split." This inspector was the only representative of the defendant company who admitted he had seen the pipe in question. While a subsequent report from an officer of the company (Plaintiff's Exhibit 6) referred to a "burst" of the tube, this report also stated "under our policy we cover the damage to the ruptured tube." Apparently before the probability of litigation arose no one seemed disposed at all to consider, or refer to, the rupture or split as an "explosion" or the result of an "explosion".

I believe that the preponderance of the evidence indicates that the damage to the pipe in the boiler was not the result of an explosion. Granted that the opening was caused, in a sense, by pressure

from within and was caused suddenly and with sufficient violence to rupture the weakened metal of the pipe, yet unless the terms "rupture" and "explosion" are necessarily synonymous, the evidence shows no more than an accidental rupture, being an accident within the terms of plaintiff's policy with the defendant, but falling short of an explosion in view of the enumerated circumstances. If the terms "explosion" and "accident" were intended by the policy to be synonymous, it would have been natural for the policy to have contained at least some reference to "explosion".

I conclude that plaintiff is entitled to recover the stipulated loss as a result of the accident covered by its policy with the defendant; that such accident did not also comprise an explosion and that, therefore, the stipulated loss is payable without diminution; that judgment should be entered accordingly, and that plaintiff is entitled to its costs.

The foregoing memorandum is deemed sufficient as findings of fact and conclusions of law. Counsel for the plaintiff should prepare, submit to opposing counsel, and present to me for signing a form of judgment.