**EQUITY OIL COMPANY, a corporation, Appellant,**

v.

**NATIONAL FIRE INSURANCE COM-PANY OF HARTFORD, a corporation, Appellee.**

**No. 5546.**

United States Court of Appeals Tenth Circuit.

July 31, 1957.

Rehearing Denied Sept. 7, 1957.

Fred H. Evans, Salt Lake City, Utah, for appellant.

A. H. Nebeker, Salt Lake City, Utah (Albert R. Bowen, Salt Lake City, Utah, was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

By its scheduled property floater policy, the appellee insured appellant's oil well drilling rig against loss or damage caused by fire, excluding however "any loss or damage \* \* \* caused by or incident to a blowout \* \* \* or any fire damage resulting therefrom." The insured brought this suit on the policy to recover for a fire loss to the insured rig. On pre-trial, the triable issues were defined as (1) whether there was a blowout; (2) if so whether the loss resulted therefrom; and (3) the amount thereof. It was agreed that the burden was on the insurer to establish that the risk was excluded from coverage.

The policy did not define the term "blowout", but it has come to have a reasonably well defined technical meaning in oil field operations and as used in

insurance policies covering such operations. See Georgia Home Ins. Co. v. Means, 5 Cir., 186 F.2d 783; Fidelity-Phenix Fire Ins. Co. of New York v. Dyer, 5 Cir., 220 F.2d 697. We have abstractly defined the term as a "condition in which a well builds up a sufficient gas pressure at the bottom of the hole and causes a rather sudden, forceful eruption or explosion which cleans out the well and causes it to go out of control", Central Mfg. Mutual Ins. Co. v. Elliott, 10 Cir., 177 F.2d 1011, 1012; and, "as a condition in which a well builds up sufficient gas pressure at the bottom of the hole to overcome the hydrostatic weight in the well, and forces its way to the ground surface." Anderson-Prichard Oil Corp. v. Parker, 10 Cir., 1957, 245 F.2d 831, 836.

Taking our definition in the Elliott case as a guide, and based on operative facts, about which there is little dispute, and sharply conflicting expert testimony concerning whether such operative facts constituted a blowout, the trial court concluded that a blowout did occur and that the fire loss resulted therefrom. On appeal from a consequent judgment for the insurer, the insured challenges the sufficiency of the facts to support the ultimate conclusions.

■ We think the judgment is supported by both basic and ultimate facts and we recite them here only to show their probative effect on the court's reasoning and for whatever value they may have as factual guides for similar problems.

The well in question was drilled with the insured rig to a total depth of 4889 feet with only a small show of gas at about 2200 feet. On a drill stem test at this interval, bottom hole pressure built up to 285 pounds per square inch in fifteen minutes, but no measurements were made of the surface pressure or gas rate. $10\frac{3}{4}$ inch casing was cemented at 265 feet, and 7 inch casing cemented at 2025 feet. The well was plugged back to 2379 feet and a 5 inch liner cemented on bottom at that depth with its top at 1956 feet. The mud in the hole was thereupon displaced with a mixture of crude and diesel oil and the liner was perforated at intervals from 2174 to 2180 feet, and 2184 to 2188 feet. All of the oil was then swabbed from the hole to test the flow capacity. Only a small gas flow was observed at the surface, insufficient to be measured on the gauge then being used. The gas was then turned to flare and burned with a flame two to three feet high, indicating a daily gas flow of approximately 25,000 cubic feet per day with no oil. When the well was closed, the bottom hole pressure built up to 330 pounds per square inch on a gauge of undisclosed type and accuracy after a shutin of less than 24 hours. About 95 barrels of oil were pumped back to fill the hole, giving it a hydrostatic head of approximately 773 pounds surface pressure.

In preparation for hydraulic fracturing, $2\frac{1}{2}$ inch hollow tubing with a $6\frac{1}{2}$ inch unset packer was run into the hole to a depth of 1860 feet. During the running of the last five or six 90 foot stands prior to reaching the 1860 foot depth, small quantities of oil flowed over the top of the tubing as it was being lowered into the hole. The blowout preventers were left open and the welling over was not considered by the operators to be interfering with the progress of the work. But, as each of the five or six successive 90 foot stands was lowered, the overflow increased to greater heights. While the final stand was being screwed in place, oil was coming out at the top of the tubing at the elevator approximately 96 feet above the derrick floor and 108 feet above the ground. This is the last eye witness observed condition. Within moments after the final stand was screwed in place, and without audible explosion, a fire suddenly started at or above the end of the tubing 96 feet above the derrick floor. Flames immediately shot up more than 30 feet above the crown block or more than 60 feet above the top of the tubing. The weather was cold and a breeze was blowing. The fire continued out of control for approximately thirty minutes with sufficient heat to buckle the

derrick and heat the crown block red. Burning oil dropped below the top of the tubing causing damage to the equipment below. The fire at the top of the tubing gradually diminished until it was burning a flame approximately one foot high above the tubing at the end of thirty minutes. In excess of fifteen barrels of oil were discharged through the tubing during and immediately preceding the fire, but the packer and other tools were not cleaned out of the hole. Seven months later the remaining oil was swabbed from the hole with no pressure indications and the well was acidized and completed for 800,000 to 1,000,000 cubic feet of gas per day.

Based on the foregoing facts, hypothetically stated, three expert witnesses called by the insurer were permitted to state as their opinion that a blowout did in fact occur, because, in their belief, there was a forceful, unexpected undesired and uncontrolled flow of fluid from the well. On cross examination, the insurer's witnesses were given the Elliott definition of a blowout and then interrogated concerning their opinions under different versions of the operative facts. But all of the witnesses remained steadfast in their belief that a blowout did occur. An expert witness for the insured testified in answer to the insured's version of the facts, hypothetically stated, that a blowout did not occur.

■ While numerous objections were made to the factual correctness of the hypothetical statements, there were no objections to the competency of the witnesses to state their opinions concerning the ultimate and decisive issue. Indeed, we think there could have been no valid objection to such testimony, for though the witnesses may have been "merely expert advocates", the weight and credibility of their testimony was essentially a matter to be decided by the trier of the ultimate fact. See Hartford Fire Ins. Co. v. Empire Coal Mining Co., 8 Cir., 30 F.2d 794; Francis v. Southern Pacific Co., 10 Cir., 162 F.2d 813; E. L. Farmer & Co. v. Hooks, 10 Cir., 239 F.2d 547; A.L.I. Model Code of Evidence, Chap.

V, Rule 401, p. 198; 7 Wigmore on Evidence, 3rd Ed., §§ 19, 20, 23.

While the trial court thought the insurer's expert testimony "more adequately supported by fact and reason and therefore more convincing", it did not deem it conclusive. The court looked at the physical facts and matters of common knowledge for the ultimate answer. In the first place, it was convinced that the fire started at the top of the tubing about 96 feet in the derrick, and not on the derrick floor. Cf. Central Mfg. Mutual Ins. Co. v. Elliott, supra. The trial court then reasoned that the sudden shooting of the flames into the air above the crown block with such violence and intensity as to cause the derrick to buckle, and the showering of the burning oil from above, was consistent only with a blowout; that the 15 barrels of oil in the tubing were cleaned out, thus removing the effective controls on the escape of the bottom hole pressure. In explanation of the absence of any discharge or eruption of the oil in the annular space between the tubing and the casing, the court thought that while the 6½ inch packer moved freely in the 7 inch casing, it left a constricted opening around the sides so that the weight of the head of fluid in the annular space caused the lighter column of fluid in the tubing to erupt as it did. The court thus rejected the insured's theory that the welling over and subsequent eruption resulted solely from the agitation of the fluid in the hole by the lowering of the tubing, "as if a straw were lowered into a 7-Up bottle where fluid came out of the end of the straw." Having concluded that the presence of the fire at the top of the tubing was cogent evidence of a blowout, the court had no difficulty concluding that the blowout was the efficient cause of the fire, most likely resulting from "the striking of the solid material discharged from the hole upon the superstructure of the rig."

To be sure, the insurance contract did not exclude only big blowouts—it excluded all blowouts, and, in the final analysis, whether the eruption, which we know did

occur, was of sufficient force and violence to be classified a blowout as we have defined it, is a matter of degree on which prudent minds may differ, depending on collateral concepts. It is not enough for reversal that as triers of the facts we would have been loath to call this incident a blowout. The question on review is whether there is a rational basis for doing so. Having answered that question in the affirmative, the judgment should be and is affirmed.

HUXMAN, Circuit Judge (dissenting).

The burden rested upon the insurance company to establish by convincing evidence not only that a blowout, as defined by us in the Elliott case, occurred but also that it preceded the fire and was the cause thereof, and that but for such blowout no fire would have occurred. The court recognized the difficulty under the facts of the case of clearly establishing what did in fact occur, but that did not relieve the insurance company of the burden of proving that a sudden forceful eruption occurred, sufficient to constitute a blowout, and that this preceded the fire and was the cause thereof.

I search the record in vain to find any facts supporting or tending to support a finding that a sudden forceful violent rending or eruptive force took place at the bottom of the hole at any time, let alone preceding the fire. The court did not base its findings of an explosion on the expert testimony. In fact, it held in effect that such testimony was insufficient to support such a finding. Neither did the court point to any evidence showing or tending to show that a violent disturbance sufficient to constitute an explosion occurred at the bottom of the hole at any time, let alone at a time preceding the fire. The court concluded that the welling over of the oil as last observed before the fire was no blowout. The court also found that "The evidence does not permit any finding of the exact agency or cause which ignited the fire."

The only direct evidence of what occurred preceding the fire was by the drillers who were in charge of and operating the well, and their undisputed evidence is that nothing unusual occurred preceding the fire which interfered with their operation of the well, and save for the fire alone they could have continued to operate the well. Buskirk was on the monkey board holding the tubing which they were readying to place into the hole. He testified that they started going into the hole with the tool; that oil came out of the hole; and that it had done so for about the five or six preceding stands of pipe which had been put in the hole; and that oil was coming out most of the time while he was holding on to the tubing. He testified that nothing unusual occurred during the operations preceding the fire and that he left when the fire started. Goodrich, the driller, was asked what unusual occurrences he had observed on that occasion. He answered, "Well, the only thing unusual that I seen was the fire." He was asked, "Q. Now, between the time you started to put that last stand, couple it onto the tube, and the time of the fire, did anything happen which had not happened in the previous five or six times? A. No. Not particularly, no.

"Q. Then except for the fire, nothing had occurred different than had, than you had been doing before? A. That's right." From this evidence it appears that no noticeable incident occurred preceding the fire. In fact, nothing had occurred which indicated turbulence or disturbance in the hole. The tools did not come out of the hole. They remained undisturbed in the hole. The casing was not bent or twisted in any way. All the property at the well remained the same as before save for the damage that was done by the fire and, aside from the short time the fire burned, the well and its equipment was in the same condition as before. What caused the fire the court could not say. It found that "The evidence does not permit any finding of the exact agency or cause which ignited the fire." But before the company may escape liability there must be a finding based upon competent evi-

dence not only that there was a blowout but furthermore that it was the proximate cause of the fire. Even if there had been a blowout which caused the eruption of large quantities of gas or hurled the tools out of the hole, the company would be liable if the sole cause of the fire was that a match was lit at the top of the hole. To merely speculate or surmise what may have occurred at the bottom of the hole is not sufficient. There must be sufficient proof of what did actually occur upon which to make a finding. I fail to find any evidence or circumstances sufficient to support a finding that a blowout occurred, as that term is used, and that the fire was the proximate result of a blowout.

For these reasons, I must respectfully dissent from the conclusions of my Associates.